**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 692 CAP |
| | : |
| Appellee | : Appeal from the Judgment of Sentence |
| | : entered on 12/18/2013 in the Court of |
| | : Common Pleas, Criminal Division of York |
| v. | : County at No. CP-67-CR-0003547-2012 |
| | : |
| | : |
| ARIC SHAYNE WOODARD, | : |
| | : |
| Appellant | : SUBMITTED:   March 6, 2015 |

**OPINION**

**MR. JUSTICE BAER**                    **DECIDED:   December 3, 2015**

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of York County upon Aric Shayne Woodard (Appellant) following his conviction of first degree murder of a two-year-old boy.[1]   For the reasons that follow, we affirm the judgment of sentence of death.

The record establishes that on Sunday, November 6, 2011, at approximately 1:00 p.m., Hayley Twinn, the mother of two-year-old Jaques Twinn, left him and his baby sister in Appellant's care.   At nineteen years of age, Hayley was overwhelmed with being a mother and relied upon Appellant to watch her children on occasion.   While Hayley thought of Appellant as a friend, the two had previously been intimate and Appellant

---

[1] Pursuant to 42 Pa.C.S. § 9711(h)(1), this Court conducts automatic review of cases where the death penalty has been imposed.

desired more than friendship. Hayley had assured Appellant that she would retrieve her children later that day, but did not do so. When Hayley still had not come to pick up her children the next morning, November 7, 2011, Appellant grew angry and called his neighbor, Niesha Mayes, looking for Hayley. In a very agitated tone, Appellant told Mayes that Hayley better come get her children or she would be sorry.

At approximately 2:21 p.m. that afternoon, the York City Police responded to a 911 dispatch to 169 West Maple Street, where a two-year-old male was under cardiac arrest.[2] Officer Ryan Anderson arrived a few minutes later and observed Appellant on the porch of the residence, holding Jaques, who was wet, naked, and smelled strongly of feces. Both Officer Anderson and emergency medical technicians, who arrived shortly thereafter, attempted CPR on the child, who was then transported to York Hospital.

While at the hospital awaiting word on Jaques's fate, Appellant stated that Hayley had dropped off the children the day before to stay with him for a few hours, but never returned and did not respond to his attempts to contact her. He explained that because Jaques had defecated and smeared it on the kitchen floor, Appellant had "popped him," suggesting that he struck the child, pulled him up by his ear, and sent him upstairs to the bathtub to clean himself. Appellant indicated that he found Jaques slumped over and unresponsive in the bathtub minutes later.

The first person to examine Jaques at the hospital was registered nurse Emily Huggins, who specialized in child abuse cases, and created a "body map" of the injuries she observed on his body, which was later admitted at trial. Dr. Daniel Carney, the trauma surgeon on duty, also examined Jaques, finding him to be cold with a distended

---

[2] As discussed infra, this address was a neighbor's home across the street from Appellant's residence at 140 West Boundary Avenue. The record establishes that West Boundary Avenue splits off onto West Maple Street. See Notes of Testimony (N.T.) (Suppression Hearing), Oct. 23, 2012, at 56.

abdomen and showing no signs of life. Life-saving measures ultimately ceased and Jaques was pronounced dead at 3:05 p.m.

In the meantime, at the crime scene, Officer Roy Kohler had previously heard Appellant say that he had been caring for more than one child. Accordingly, while Appellant was at the hospital, the officer entered his residence for the sole purpose of checking on the welfare of any children left behind. Officer Kohler did not find any children in the home, did not move or collect any evidence, and did not take photographs. Shortly thereafter, neighbor Della Smith informed Officer Kohler that she was caring for Jaques's baby sister and needed to go into Appellant's home to get diapers for the baby. Officer Kohler thereafter reentered the home and did a cursory look for diapers, finding none. Again, the officer took no evidence or photographs and did not manipulate anything in the home. At 5:20 p.m., officers obtained a search warrant, purportedly for Appellant's home. Prior to executing the warrant, however, the officers realized that the address on the warrant was not Appellant's, but rather was that of the neighbor's home from where the 911 call was made. A corrected search warrant was obtained and executed at 5:40 p.m. At that time, police took photos of the crime scene and recovered, *inter alia*, pieces of a leather belt, a bong and baggie containing a leafy green substance, clothing, paperwork, a mobile phone, and a laptop.

After Appellant left the hospital, he went to the York City Police Department and police interviewed him. He explained to detectives why he was caring for Hayley's children and denied that he hurt Jaques intentionally. Appellant admitted, however that he slapped the child for defecating himself, pulled him up by his ear, and directed him to go to the bathtub. He stated that he found the child slumped over and unresponsive in the bathtub less than ten minutes thereafter.

Four days later, on November 11, 2011, Appellant went to the police station voluntarily and was interviewed by Detective Alan Clarkson. The detective informed Appellant that he was not under arrest and that the interview would be audio and video recorded. After Appellant sat down, he told Detective Clarkson that he had spoken to Attorney Alan Rutt on an unrelated matter two days before and that Attorney Rutt had warned him not speak to the police without an attorney present. Transcript of Interview, Nov. 11, 2011, at 2, 59. Appellant did not, however, request that Attorney Rutt or any other attorney be present during the interview, nor did he indicate that he did not want to speak with police without an attorney present.

When Appellant began discussing his general view on disciplining children, Detective Clarkson interrupted and read him Miranda[3] warnings, reiterating, however, that Appellant was not under arrest at that time. Appellant indicated that he understood his rights and stated, "[b]elieve me, there's no reason for a lawyer here." Id. at 16. He then began to explain the events that took place on November 7, 2011. Specifically, Appellant stated that he slapped Jaques for defecating on the floor, pulled him by the ear to lead him upstairs for a bath, id. at 25-26, filled the tub with a few inches of water, and left Jaques in the bathtub alone. Id. at 29. Appellant explained that when he returned to the bathtub a few minutes later, Jaques was slumped over and unresponsive. Id. at 30. He stated that it did not look like Jaques's face was in the water. Id. at 31. Appellant explained that when he retrieved the child from the bathtub, Jaques vomited. Id. at 35.

Frightened, Appellant stated that he carried Jaques to his neighbor's house across the street, and had someone call 911. Pursuant to the 911 responder's direction, Appellant stated that he administered CPR on Jaques, and medical emergency personnel arrived and continued the CPR. Id. at 45-46, 50. When asked how he

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

believed Jaques died, Appellant responded that he thought the child must have drowned in the bathtub because no abuse occurred. Id. at 113. When the interview concluded, Detective Clarkson asked Appellant to take a voice stress test, which the detective explained "senses deception," and Appellant refused, asserting that he wanted to speak to Attorney Rutt first. Id. at 120, 122-23.

Appellant was not arrested for Jaques's murder until more than four months later on March 20, 2012, after police received the autopsy report, which indicated that the cause of Jaques's death was blunt force trauma and that the manner of death was homicide. While still handcuffed after the arrest, Detective Clarkson again interviewed Appellant. The detective read Miranda warnings and Appellant reiterated that he understood his rights. When asked if he wanted to make a statement, he responded, "I'll answer whatever you want, you know, I could care less. I already told you that." Interview Transcript, Mar. 20, 2012, at 3. Appellant then reiterated the events of the day of the murder, as outlined above. When the detective confronted Appellant with the findings in the autopsy report, he denied any physical abuse or wrongdoing. After the interview was completed and Appellant was told what would happen to him later that evening, Appellant stated that his attorney was Clarence Allen, and that he had just seen Attorney Allen at the corner barber shop. Id. at 27.

Prior to trial, Appellant filed a motion to suppress the statements he made during the police interviews conducted on November 11, 2011, and March 20, 2012, in which he admitted to caring for Jaques during the time the fatal injuries were inflicted and acknowledged that he had struck Jaques for defecating on the floor. Appellant also sought to suppress all physical evidence seized from his home. The trial court conducted a suppression hearing on October 23, 2012, and November 1, 2012, after which it denied Appellant's suppression motion, finding that he waived his right to counsel

and voluntarily made the statements to police. The trial court further held that no physical evidence was seized from Appellant's residence until after a valid search warrant had been obtained. Additionally, Appellant filed a pretrial motion seeking dismissal of the charge of first degree murder for lack of evidence of a specific intent to kill, which the trial court denied. He further filed a pretrial motion to quash the aggravating circumstance of torture for lack of evidence, which the trial court also denied after conducting an evidentiary hearing.

The Commonwealth subsequently filed a pretrial motion *in limine*, seeking to admit various autopsy photos. Appellant objected to the admission of the photos, contending that any probative value in determining the nature of the victim's injuries and the cause of death was outweighed by the photos' prejudicial impact. Following a hearing where expert medical testimony was presented, the trial court granted the Commonwealth's motion and ruled that thirteen autopsy photos (twelve color and one black and white), from a much larger array of pictures, were admissible at trial.

At trial, the Commonwealth presented the testimony of forensic pathologist, Dr. Samuel Land, who had performed Jaques's autopsy the day after the murder. Utilizing the autopsy photos, Dr. Land summarized the multitude of injuries that he documented over the child's entire body. He noted at least ten to twenty bruises, a significant number of which had been inflicted within hours before Jaques's death, as demonstrated by the fact that blood poured out of the bruises when cut. N.T. (Trial), Volume IV, Oct. 22, 2013, at 894, 926. The bruises appeared on Jaques's face, forehead, left eye, cheeks, jaw, left ear, right side and back of his head, chest, shoulder, abdominal region, back, buttocks, arms, hips, and thighs. Id. at 893, 898, 910, 919, 922, and 924. Dr. Land opined that the injuries resulting in the various bruises would have caused considerable pain to Jaques. Id. at 933.

Dr. Land found that the most significant injury to Jaques's torso was the laceration to the victim's liver, extending almost completely through the liver, which occurred several hours before Jaques's death. Id. at 925, 927. He acknowledged that it would take a significant amount of force to lacerate the child's liver, such as would occur in a severe motor vehicle accident. Id. at 903. Dr. Land stated that the injury to Jaques's liver would have caused severe pain and also nausea, vomiting, and loss of bowel control, and could not have been caused by the life saving measures attempted by emergency medical technicians. Id. at 929, 937. He further observed that due to the tear in the liver, a fairly significant amount of blood pooled in Jaques's abdomen, causing the abdomen to be extended abnormally. Id. at 924. It was Dr. Land's opinion that the damage to the liver was a fatal injury.

Dr. Land also found there was significant injury to Jaques's adrenal gland caused by Jaques being struck in the back several days prior to death. Id. at 901-02. Although Dr. Land also observed a fresh hemorrhage in the right adrenal gland, which was inflicted near the time of death, he concluded that the adrenal gland injury was not, itself, fatal. Id. at 902, 926-27, 932.

Finally, Dr. Land explained the significant injuries to Jaques's head. He stated there were bruises inside Jaques's scalp, unobservable from the surface of the skin, which resulted from recent blows to the head. Id. at 893. He indicated there were bilateral subdural hemorrhages, which Dr. Land explained to be thin bleeding on both sides of the brain caused by blunt force trauma. Id. at 896-97. Dr. Land testified that Jaques's brain trauma could have occurred by striking Jaques's head or by hurling the child's head about in a forceful manner. Id. at 898. He opined that the head injury was the final injury inflicted at the time of death, and was fatal. Id. at 926-27, 931.

Dr. Land considered, but ruled out death by drowning, explaining that drowning is diagnosed by excluding every other possibility and the presence of lethal head trauma and lethal trauma to the torso established that drowning was not a possibility. Id. at 934. He clarified that a two-and-a-half-year-old child would not be in a bathtub slumped over with his face in the water because, if neurologically intact, such child would be able to extricate himself from that position and would simply sit up. Id. Dr. Land concluded that Jaques was beaten to death, i.e., that the cause of the victim's death was multiple blunt force trauma, and that the manner of death was homicide. Id. at 942, 953.

Appellant did not testify on his own behalf. He presented the testimony of pathologist, Dr. Richard Bindie. Contrary to Dr. Land's medical opinion, Dr. Bindie opined that Jaques's brain hemorrhaging was not fatal and that the head injuries could have resulted from the child hitting his head during a fall several days before his death. N.T. (Trial), Volume V, Oct. 23, 2013, at 1151-52. He testified that Jaques's severely lacerated liver was caused by aggressive and prolonged CPR and other life-saving measures. Id. at 1145-46, 1154. Dr. Bindie concluded that the victim died as a result of drowning, and not homicide. Id. at 1140.

During jury deliberations, the trial court permitted the jury to view Jaques's hospital records, autopsy report, and the reports from both expert witnesses. Crediting the Commonwealth's expert over that of the defense, the jury thereafter convicted Appellant of first degree murder. At the penalty phase of trial, the parties stipulated to the aggravating circumstance that the victim was a child less than twelve years of age. 42 Pa.C.S. § 9711(d)(16). The Commonwealth incorporated the trial record to support the aggravating factor that the offense was committed by means of torture, id. § 9711(d)(8),

and did not present any additional evidence.[4]   In mitigation, Appellant presented the testimony of friends and family members who described him as a good and loving person who cared for the victim, other children, and his family.   Appellant also testified on his own behalf during the penalty phase and informed the jury about the care that he had provided to Jaques and his sister in the past.

The jury subsequently returned a verdict of death, concluding that the two aggravating circumstances found, *i.e.*, the age of the victim and torture, outweighed the two mitigating circumstances of no significant history of prior criminal convictions, id. § 9711(e)(1), and any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense, id. § 9711(e)(8) (specifically listed by the jury as the "defendant had a prior history of caring for the victim").   Sentencing Verdict Slip, dated Oct. 28, 2013, at 3.

Appellant filed post-sentence motions, which the trial court denied.   This direct appeal followed, raising twelve issues for our review.

## I.   Sufficiency of the Evidence

As in all cases where a death sentence has been imposed, we begin by conducting an independent review of the sufficiency of the evidence to sustain the conviction for first degree murder.   Commonwealth v. Perez, 93 A.3d 829, 840 (Pa. 2014); Commonwealth v. Zettlemoyer, 454 A.2d 937, 942 n.3 (Pa. 1982).   Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary.   Commonwealth v. Sanchez, 36 A.3d 24, 37 (Pa. 2011).

---

[4] As described in detail infra, to refute the torture aggravator during the penalty phase of trial, Appellant presented the testimony of a medical expert.

"In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." Commonwealth v. Fears, 836 A.2d 52, 58-59 (Pa. 2003). The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Commonwealth v. Spell, 28 A.3d 1274, 1278 (Pa. 2011). Further, the trier of fact is free to believe all, part, or none of the evidence. Commonwealth v. Martin, 101 A.3d 706, 718 (Pa. 2014).

Accordingly, to sustain Appellant's conviction of first-degree murder, we must conclude that the evidence established beyond a reasonable doubt the three elements of first-degree murder: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); Commonwealth v. Houser, 18 A.3d 1128, 1133 (Pa. 2011). First-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d); Commonwealth v. Burno, 94 A.3d 956, 969 (Pa. 2014).

Appellant contends there was insufficient evidence demonstrating the requisite specific intent to kill for first degree murder.[5] He argues there were no eyewitnesses to Jaques's assault, and no evidence detailing the nature of the assault such as where it occurred, how long it lasted, or when the child was rendered unconscious. He proffers that absent evidence of such details, it is mere speculation to conclude that he beat Jaques with the intent to kill him. According to Appellant, he could have acted in a rage

---

[5] This contention is set forth in Issue VI in Appellant's brief, which challenges the trial court's denial of a motion seeking the dismissal of the charge of first degree murder based upon the lack of evidence of the specific intent to kill. See Brief for Appellant at 38-39.

in a short period of time, not realizing the consequences of his actions, especially considering the great disparity of size between himself and the two-year-old victim. He submits that his efforts to seek aid for Jaques, by asking neighbors for help and attempting CPR, further suggest that he lacked the requisite intent to kill. Appellant concludes that the Commonwealth's evidence was insufficient to prove even a *prima facia* case that he intended to kill the victim, and that the trial court erred not only by sustaining his conviction of first degree murder, but also by denying his pretrial motion to dismiss that charge.

The Commonwealth refutes Appellant's sufficiency challenge and contends that the record establishes both a *prima facie* case and sufficient evidence to sustain his first degree murder conviction. It asserts that the *prima facie* case against Appellant was premised on his deliberate and prolonged beating of Jaques, which was demonstrated by the autopsy report, autopsy photos of fresh bruises covering most of Jaques's body, the preliminary hearing testimony of forensic expert nurse Emily Huggins who created a body map of Jaques's bruises, and Appellant's statements that he had struck Jaques while he acted as caregiver during the time period that the fatal injuries were inflicted. This evidence was further supplemented, the Commonwealth contends, by Dr. Land's trial testimony that Jaques suffered the laceration to his liver hours before his death, and later suffered the brain injury at or around the time of death, and that both injuries could have each, individually, been fatal. The Commonwealth reiterates Dr. Land's medical conclusion that the cause of death was multiple blunt force trauma, not accidental drowning, and that the manner of death was homicide.

Further, the Commonwealth submits that this Court has consistently rejected the premise that there must be evidence of a single fatal blow in order to find the specific intent to kill in cases where death results from the prolonged beating of the victim. See

Commonwealth v. Chambers, 980 A.2d 35, 46-48 (Pa. 2009) (confirming the lack of merit to the "final fatal blow" argument and finding specific intent to kill where the defendant engaged in a continued pattern of child abuse and ultimately threw the three-year-old child across the room into a radiator and left her to suffocate between a bed and a wall); Commonwealth v. Powell, 956 A.2d 406 (Pa. 2008) (rejecting claim of lack of evidence of specific intent to kill where the defendant repeatedly beat his six-year-old son, causing a seizure that resulted in death by asphyxiation because there is nothing in law requiring a final fatal blow to demonstrate a specific intent to kill); Commonwealth v. Smith, 675 A.2d 1221 (Pa. 1996) (plurality) (finding sufficient evidence of first degree murder where a five-month-old baby died while in the defendant's care and expert medical testimony established that the cause of death was six to ten blows to the baby's head). The Commonwealth concludes that, consistent with this case law examining the defendant's entire course of conduct in child abuse murder cases, there is sufficient evidence that Appellant possessed the specific intent to kill.

The trial court agreed with the Commonwealth and held there was sufficient evidence of a specific intent to kill to support both the charge of first degree murder and the conviction. It cited Chambers and Powell, supra, for the proposition that physical child abuse resulting in death is sufficient to sustain a jury's finding that the defendant possessed the specific intent to kill, despite the medical examiner's inability to diagnose the "final blow" that caused the death. The trial court held that, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence established that Appellant was angry with Hayley for leaving her children at his home and beat her son to death. It reasoned that the jury was free to infer Appellant's specific intent to kill from his use of deadly force on Jaques's body. The court relied on the autopsy photos depicting Jaques's extensive and recent bruises, Dr. Land's comprehensive testimony on the

cause and manner of death, and the fact that Appellant was about four times the size of the two-year-old victim. Based on the medical evidence, the trial court opined that Appellant placed Jaques in the bathtub after fatally beating him, evidencing an attempt to mask the true cause of death by suggesting that the child drowned accidentally in the bathtub. These facts, the court concluded, were more than sufficient to establish the requisites of first degree murder.

Upon careful scrutiny of the record, we agree with the trial court that there is sufficient evidence to support Appellant's conviction of first degree murder. When viewed in the light most favorable to the Commonwealth as verdict winner, the evidence establishes that Jaques was unlawfully beaten to death, that Appellant was responsible for the killing, and that Appellant acted with malice and a specific intent to kill as demonstrated by his use of deadly force upon the helpless two-year-old victim that he was entrusted to protect. We reject Appellant's claim that his conviction was based upon mere speculation because there was no evidence describing with particularity how the beatings were carried out and at what point the defenseless toddler was rendered unconscious from Appellant's vicious attack. This Court rejected a similar contention in Powell, supra, where we upheld the jury's finding of specific intent to kill where the defendant repeatedly beat his six-year-old son, causing a seizure that resulted in death by asphyxiation, but where there was no evidence relating to the final blow that ultimately caused the death.

We stated:

> There is nothing in the law, logic, or human experience that provides, as a matter of law, that specific intent cannot be found when the medical examiner cannot point to a specific blow as the definitive cause of death. The very personal nature of a beating such as this negates the notion that a specifically identifiable killing blow is required to prove specific intent. After each beating, indeed, after each blow, appellant had time to reflect on what he was doing to his son. And, with the final "stomping" he administered to

various vital parts of the child's body, appellant had ample time to appreciate the lethality of his conduct. The jury acted well within its authority in finding specific intent.

Powell, 956 A.2d at 417.

We reaffirmed this principle in Chambers, supra, where we found the specific intent to kill where the defendant engaged in a continued pattern of child abuse and ultimately threw a three-year-old child across the room into a radiator, and proceeded to catapult her again, leaving her between a bed and a wall to suffocate to death. We stated that "[t]he fact that appellant argues that he 'only' intended to abuse [the child victim] in the days before her murder does not mean the jury was obliged to believe that theory (for which there was no testimonial support), nor does it somehow negate a finding that he decided later to kill her." Id., 980 A.2d at 47. We emphasized that "[t]he jury is no less able to measure the totality of the circumstances against the settled definition of specific intent in child-abuse murders than it is in other first-degree murder prosecutions." Id. See also Commonwealth v. Tharp, 830 A.2d 519, 527 (Pa. 2003) (holding that by causing her young daughter's death through a prolonged period of abuse and starvation, the defendant exhibited not a lack of a specific intent to kill, but rather a "unique type of coldness and deliberation," which "reveals the sort of premeditation and deliberation that separates first degree murder from other killings").

We reach the same conclusion here. The expert medical testimony of Dr. Land established that hours before Jaques died, during the period in which he was in Appellant's exclusive care, Jaques was struck with such force that his liver was lacerated between the right and left lobes with the tear extending almost completely through the liver, causing a significant amount of blood to pool into Jaques's abdomen. N.T. (Trial), Volume IV, Oct. 22, 2013, at 900. Dr. Land compared the amount of force used to that which occurs in a severe motor vehicle accident. Id. at 902. Dr. Land explained that the liver laceration would cause Jaques significant pain, nausea, vomiting, and loss of bowel

control, and concluded that such injury could cause death. Id. at 929. He further opined that hours later, near the time of death, again while in the exclusive care of Appellant, Jaques was struck in the head with such force as to cause bilateral subdural hemorrhages, which is bleeding on both sides of the brain. Id. at 896-97. Dr. Land testified that Jaques's brain trauma could have occurred by striking Jaques's head or by hurling the child's head about in a forceful manner. Id. at 898. He opined that the head injury was the final injury inflicted at the time of death, and was fatal. Id. at 926-27, 931.

This medical evidence repudiates Appellant's theory that he may have acted in a rage, causing Jaques's injuries in a short amount of time without realizing the devastating effects of his behavior, thereby disproving any specific intent to kill. Rather, the Commonwealth's medical evidence establishes that Jaques was beaten over a period of hours until the child succumbed to the fatal blows. The fact that Appellant sought aid for the child whom he fatally bludgeoned does not negate his specific intent to kill. While the jury was free to believe the defense medical expert that Jaques's death resulted from accidental drowning, it did not do so, and Appellant's sufficiency challenge fails.

Because the evidence was sufficient to establish the elements of first degree murder, it likewise was sufficient to demonstrate the lesser standard of a *prima facie* case of guilt. See Commonwealth v. Karetny, 880 A.2d 505, 514 (Pa. 2005) (holding that, at the preliminary hearing stage of a criminal prosecution, the Commonwealth need only put forth sufficient evidence to establish a *prima facie* case of guilt, which exists when there is evidence of each of the material elements of the crime charged and probable cause to warrant the belief that the accused committed the offense). Accordingly, we further reject Appellant's contention that the trial court erred by denying his pretrial motion to dismiss the charge of first degree murder.

## II. Admissibility of Photographs

Appellant next challenges the admissibility of thirteen autopsy photographs. Twelve color photos depicted Jaques's external injuries and one black and white photo portrayed Jaques's lacerated liver. As background information, the Commonwealth filed a motion *in limine* to introduce photographs taken during Jaques's autopsy. The trial court conducted an evidentiary hearing on October 4, 2013, during which Dr. Land testified that the photographs were necessary to demonstrate that the cause of death was multiple blunt force trauma and not accidental drowning. Dr. Land opined that the jury should examine color photos of external injuries so that it could differentiate between markings on Jaques's body caused by the beatings and discolorations of the skin resulting from birthmarks and/or Jaques's skin disorder of eczema. Finally, Dr. Land opined that it was imperative to show the jury several photographs of Jaques's various injuries, rather than a select few, so that the jury could comprehend the numerous injuries inflicted. On cross-examination, Dr. Land conceded that he was able to testify to the cause and manner of death in previous homicide cases without the aid of photographs, but explained that those murders did not involve the beating death of a child.

On October 9, 2013, the trial court entered an order granting the Commonwealth's motion *in limine*, holding that the probative value of the photos outweighed any prejudicial impact. The court found that the Commonwealth satisfied its burden of demonstrating that the photos were necessary to rebut the defense of accidental drowning and to provide clarity to the jury by distinguishing the injuries causing death from skin discolorations existing prior to the murder. The court indicated that the photos were neither cumulative nor too numerous as they were selected from a much larger photoset. Acknowledging that the photos depicted a deceased two-year-old child victim, which would have great impact on a jury, the trial court reasoned that to exclude the photos on that basis alone would be to reward a perpetrator for choosing a child as a victim.

When the Commonwealth introduced the autopsy photographs at trial, Appellant reiterated his objections, which the trial court denied. Consistent with its pretrial ruling, the trial court held in its Pa.R.A.P. 1925(a) opinion that the autopsy photos were highly relevant to the case based on the reasoning set forth in its order granting the Commonwealth's motion *in limine*.

Echoing his prior argument, Appellant now contends that the trial court erred by granting the Commonwealth's motion *in limine* and admitting the photographs at trial. He maintains that the photos are highly inflammatory and prejudicial and that their admission was unnecessary because the nature and extent of Jaques's injuries could have been conveyed to the jury effectively through the testimony of Dr. Land. Appellant submits that the images of Jaques's external injuries were more prejudicial than probative, considering that none of the external injuries were fatal.

The Commonwealth responds that the photographs were admissible because they were not inflammatory and were essential to prove that Appellant possessed the requisite intent to commit first degree murder. It relies on case law holding that a trial court does not abuse its discretion by admitting autopsy photographs of the victim where such evidence was required to prove the defendant's specific intent to kill. See Commonwealth v. Wade, 389 A.2d 560, 566 (Pa. 1978) (holding that the trial court did not abuse its discretion by admitting eight color autopsy photographs of the two-year-old victim of voluntary manslaughter to prove the extent of the beatings where the defense was that the child died from injuries after an accidental fall); Commonwealth v. Brown, 416 A.2d 1069, 1071 (Pa. Super. 1979) (holding that color photographs of the victim in a child endangerment case were admissible to prove the nature and extent of the injuries inflicted); see also Commonwealth v. Chester, 587 A.2d 1367, 1374 (Pa. 1991) (holding that a gruesome photograph of a murder victim's slashed throat was admissible, even if

inflammatory, where the photo was essential evidence of the defendant's specific intent to kill).

"The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion." Commonwealth v. Reid, 99 A.3d 470, 493 (Pa. 2014). An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Commonwealth v. Davido, 106 A.3d 611, 645 (Pa. 2014).

When the Commonwealth seeks to introduce photographs of a homicide victim into evidence, the trial court must engage in a two-part analysis. First, the trial court must examine whether the particular photograph is inflammatory. Commonwealth v. Murray, 83 A.3d 137, 156 (Pa. 2013). If the photograph is not inflammatory, it may be admitted if it is relevant and can serve to assist the jury in understanding the facts of the case. Id. If the photograph is inflammatory, the trial court must determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. Id.

Upon examining the photographs, we hold that the trial court acted within its discretion when it concluded that the images depicted were not inflammatory. As noted, the twelve challenged color photographs portrayed various parts of Jaques's body and illustrated the nature and extent of his injuries, which would not have been readily detectable in a black and white photo. The single black and white photo depicted the internal injury of Jaques's lacerated liver. The jury was not given the photographs to examine during deliberations, but viewed them in connection with Dr. Land's testimony explaining the findings in his autopsy report.

Even assuming the photographs were inflammatory, we conclude, without hesitation, that they were highly probative as they related directly to the requisite elements of first degree murder, *i.e.*, that Jaques was unlawfully killed, as opposed to having drowned by accident, and that Appellant possessed the specific intent to kill. We reject Appellant's contention that the photographs constituted cumulative evidence because Dr. Land testified to the nature of Jaques's injuries and the cause of his death. See Commonwealth v. Watkins, 108 A.3d 692, 724 (Pa. 2014) ("[t]he mere fact that a medical examiner testified to the nature of the victim's injuries and the cause of death does not render photographs of the victim duplicative"); Commonwealth v. Pruitt, 951 A.2d 307, 319 (Pa. 2008) (holding that photographic evidence of the victim's injuries is not rendered duplicative merely because a medical examiner or other comparable expert witness has conveyed to the jury, in appropriate clinical language, the nature of the victim's injuries and the cause of death). Further, as noted cogently by the Commonwealth, the circumstances presented herein are akin to those that arose in Wade, supra, where this Court found no abuse of discretion when the trial court admitted eight color autopsy photographs of the two-year-old victim to show the extent of the child's injuries and to refute the defense theory that the injuries suffered were the result of an accidental fall. Accordingly, Appellant's claim fails.

### III. Jury's Review of Materials During Deliberations

Appellant next contends that the trial court abused its discretion by granting the jury's request to review during deliberations the autopsy report, reports drafted by the medical experts for both the prosecution and the defense, and Jaques's medical records. He maintains that providing the jury with such documents during deliberations was error because they were too complex for the jury to understand absent expert medical testimony. See Pa.R.Crim.P. 646, cmt. (citing Commonwealth v. Pitts, 301 A.2d 646,

650 n.1 (Pa. 1973) (noting that "it would be a better procedure not to allow exhibits into the jury room which would require expert interpretation")).[6]   Appellant further submits that allowing the jury to examine the enumerated documents during deliberations resulted in the admission of improper hearsay statements and violated his constitutional right to confrontation.   To illustrate, he explains that while deliberating, the jury could have focused upon some unidentified portion of an expert report, which was not testified to during trial, thereby denying Appellant the opportunity for cross-examination.

The Commonwealth responds that this issue is governed by Pennsylvania Rule of Criminal Procedure 646 (Material Permitted in Possession of the Jury), which provides that "a jury may take with it such exhibits as the trial judge deems proper," except for enumerated items, none of which are implicated here.[7]   It explains that Rule 646's

---

[6] In Pitts, this Court rejected the contention that the trial court erred by permitting the jury to take a fingerprint chart into the jury room during deliberations and held that such matter was within the discretion of the trial court.   In a footnote, however, we stated "[a]lthough we fail to see any abuse of discretion, it would be a better procedure not to allow exhibits into the jury room which require expert interpretation."   Accordingly, Appellant is relying on *dicta*, rather than the holding in Pitts to suggest impropriety by the trial court below.

[7] Rule 646, entitled, "Material Permitted in Possession of the Jury" provides, in its entirety, as follows:

> (A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C).

> (B) The trial judge may permit the members of the jury to have for use during deliberations written copies of the portion of the judge's charge on the elements of the offenses, lesser included offenses, and any defense upon which the jury has been instructed.

> > (1) If the judge permits the jury to have written copies of the portion of the judge's charge on the elements of the offenses, lesser included offenses, and any defense upon which the jury has been instructed, the judge shall provide that portion of the charge in its entirety.

(continued…)

purpose in excluding specific items, such as the defendant's confession or a copy of the indictment, is to prevent the jury from giving greater emphasis to certain evidence while deemphasizing other evidence. Here, the Commonwealth points out, no bias resulted because the medical expert reports taken into the jury's deliberation room were from both parties. Moreover, it asserts, the documents examined by the jury are highly relevant regarding the injuries and the cause of death, and the jury heard direct and cross-examinations of each medical professional who submitted a report. Thus, the Commonwealth concludes, the documents submitted for the jury's examination during deliberations would not have skewed the jury's understanding or perception of the evidence and no prejudice resulted therefrom. Finally, the Commonwealth argues that the portion of Appellant's claim relating to the autopsy report and Jaques's medical

---

(…continued)

        (2) The judge shall instruct the jury about the use of the written charge. At a minimum, the judge shall instruct the jurors that
            (a) the entire charge, written and oral, shall be given equal weight; and
            (b) the jury may submit questions regarding any portion of the charge.

     (C) During deliberations, the jury shall not be permitted to have:
        (1) a transcript of any trial testimony;
        (2) a copy of any written or otherwise recorded confession by the defendant;
        (3) a copy of the information or indictment; and
        (4) except as provided in paragraph (B), written jury instructions.

     (D) The jurors shall be permitted to have their notes for use during deliberations.

Pa.R.Crim.P. 646.

evidence is waived because the only objection Appellant lodged at trial related to the medical expert reports.

The trial court denied Appellant relief on this claim, holding that pursuant to Rule 646, the decision of whether the jury should be permitted to examine a particular exhibit during deliberations is within the trial court's sound discretion. The court held that it did not abuse its discretion because the expert reports permitted into the jury room were not expressly prohibited by Rule 646 and were highly relevant to the cause and manner of death. It further noted there was no bias because expert reports from both sides were permitted into the jury room and the jury heard the testimony of each expert witness who authored a report. Finally, the trial court reiterated the Commonwealth's position that Appellant waived any objection to the jury examining Jaques's medical records and the autopsy report during deliberations because his objection at trial was limited to the expert reports.

We hold that Appellant has failed to demonstrate an abuse of discretion. Initially, we agree that Appellant waived the claim that the jury improperly reviewed the autopsy report and Jaques's medical records during deliberations as his objection related only to the jury receiving the expert reports. See N.T. (Trial), Volume V., Oct. 24, 2013, at 1300. Relating to the medical expert reports, we find that they are not specifically precluded from examination during deliberations pursuant to Rule 646(C) and that it is unlikely that the jury would be skewed by placing undue emphasis on one report over the other, considering that the expert medical reports from both the prosecution and the defense were permitted in the jury room. See Commonwealth v. Strong, 836 A.2d 884, 888 (Pa. 2003) (holding that the underlying reasons for excluding certain items from the jury's deliberations is to prevent the jury from placing undue influence on the material and deemphasizing other evidence not in the room; prejudice will be found if there is a

likelihood that the importance of the evidence will be skewed). We further reject Appellant's unsupported claim of hearsay and denial of his right to confront witnesses as the jury heard the direct and cross-examination of both experts whose reports were permitted into the jury room during deliberations. Because no prejudice arose from the jury's examination of the expert reports, Appellant is not entitled to relief.

### IV. Suppression of Appellant's Statements

Appellant next challenges the trial court's denial of his motions to suppress statements he made to police on November 11, 2011, and March 20, 2012. Because he presents distinct arguments relating to each claim, we address them separately.

### A. November 11, 2011 Statement

Appellant argues that the Fifth Amendment to the United States Constitution requires the suppression of his November 11, 2011 statement to police because his interrogation continued after he invoked his right to counsel by stating that his lawyer cautioned against speaking to police without counsel present.[8] The Commonwealth responds that Appellant did not invoke his right to counsel, but noted that he had counsel in a separate matter. It asserts that Appellant never stated that he desired counsel for that particular interview, did not indicate that he wished to remain silent, and did not attempt to stop the interview due to the lack of counsel.

---

[8] The Fifth Amendment right to counsel was recognized in Miranda v. Arizona, supra, and protects a suspect's "desire to deal with police only through counsel," McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) (quoting Edwards v. Arizona, 451 U.S. 477, 484 (1981)), and is not offense-specific; it attaches upon custodial interrogation, and once invoked, prohibits any further questioning of a suspect until counsel is present. Arizona v. Roberson, 486 U.S. 675, 686-87 (1988); but see Maryland v. Shatzer, 559 U.S. 98 (2010) (holding that the release of an incarcerated suspect into the general prison population for a minimum of two weeks constitutes a break in Miranda custody, which serves to terminate the protection afforded by Edwards).

Following an evidentiary hearing, the trial court credited the facts as set forth by the Commonwealth and denied suppression. In its opinion supporting the suppression order dated January 25, 2013, the trial court held that Appellant was not in custody on November 11, 2011, because Appellant voluntarily went to the police station, was not restrained in any way during the interview, and was free to leave. Finding that Appellant was never taken into custody, the court concluded that the Fifth Amendment right to counsel did not attach. Even assuming, *arguendo*, that Appellant was in custody, the trial court held that Appellant made no statement that could be reasonably interpreted as invoking his right to counsel. It explained that merely mentioning that one has an attorney on another matter is not the same as requesting the presence of an attorney during an interview on the matter at issue. Finally, the trial court noted that when asked to take a voice stress test at the end of the interview, Appellant declined to do so absent legal consultation, thereby comprehending there were circumstances when the advice of a lawyer would be advantageous.

Our review of a suppression ruling is limited to determining whether the record supports the findings of fact of the suppression court and whether the legal conclusions drawn from those factual findings are correct. Commonwealth v. Briggs, 12 A.3d 291, 320 (Pa. 2011). When the defendant appeals an adverse suppression ruling, the appellate court may consider only the evidence presented for the Commonwealth and the evidence of the defense that remains uncontradicted when fairly read in the context of the entire record. Commonwealth v. Pruitt, 951 A.2d 307, 317 (Pa. 2008). While we are bound by the suppression court's factual findings, we are not bound by that court's legal conclusions, which we review *de novo*. Commonwealth v. Snyder, 963 A.2d 396, 400 (Pa. 2009).

We are further guided by Miranda, supra, where the United States Supreme Court declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation. 384 U.S. at 474. To avoid difficulties of proof and to provide guidance to officers conducting interrogations, the determination of whether an accused invoked the right to counsel is an "objective inquiry." Davis v. United States, 512 U.S. 452, 458-59 (1994). The High Court has further held that a suspect invoking his Miranda right to counsel must do so "unambiguously." Id. at 459. To invoke the Fifth Amendment right to counsel effectively, the accused must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." McNeil v. Wisconsin, 501 U.S. at 178 (emphasis omitted); see also Commonwealth v. Keaton, 45 A.3d 1050, 1067 (Pa. 2012) (same). If an accused makes a statement concerning the right to counsel that is "ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her Miranda rights. Davis, 512 U.S. at 461-62.

Upon careful review of the record and the governing legal principles, we conclude that the facts as found by the suppression court are supported by the record and the legal conclusions drawn from those facts are correct. To reiterate, the record establishes that on November 11, 2011, four days after the murder, Appellant went to the police voluntarily and was interviewed by Detective Alan Clarkson.[9] No autopsy report had yet

---

[9] As referenced supra, this was not Appellant's first interview with police as he had made a recorded statement at police headquarters on the night of the murder, indicating that he had slapped Jaques for defecating on the carpet, grabbed him by his ear in an effort to get him upstairs to the bathroom to clean up, and discovered Jaques unresponsive in the bathtub minutes later. Transcript of Nov. 7, 2011 Interview, at 10, 12. Notably, Appellant does not challenge the admissibility of the November 7, 2011 statement or argue that it is materially different from the November 11, 2011 statement. See Commonwealth v. Hughes, 639 A.2d 763, 771 (Pa. 1994) (deeming the admission of a (continued…)

been completed at that time, thus, the precise cause of Jaques's death remained unknown. The moment Appellant sat down, he stated that he had spoken to his counsel in an unrelated matter two days before (later identified as Attorney Alan Rutt) who warned Appellant not to speak to police without an attorney present. Transcript of Interview, Nov. 11, 2011, at 2. Significantly, however, Appellant did not indicate that he wanted Attorney Rutt or any other attorney present during the questioning and the interview continued.

Notably, when Appellant began explaining his general view on disciplining children, Detective Clarkson interrupted and read him Miranda warnings, reiterating, however, that Appellant was not under arrest at that time. Appellant indicated that he understood his rights and stated, "[b]elieve me, there's no reason for a lawyer here." Id. at 16. He then reiterated the general substance of his November 7, 2011 statement to police, *i.e.*, that he had slapped Jaques for defecating on the carpet, grabbed him by the ear in an effort to get him upstairs to the bathroom to clean up, and discovered Jaques unresponsive in the bathtub minutes later. When the detective asked Appellant how Jaques died, he responded that he thought the child must have drowned in the bathtub because no abuse occurred. Id. at 113. At the end of the interview, Detective Clarkson requested that Appellant take a voice stress test, which the detective explained was like a "truth verification test" that "senses deception." Id. at 120. Appellant declined, asserting that he wanted to speak to Attorney Rutt first. Id. at 121-23. Accordingly, no voice stress test was given.

---

(…continued)
statement to be harmless error because the objectionable statement was merely cumulative of other evidence that had been admitted properly). Similarly, Appellant does not suggest any material difference between his November 7, 2011 statement to police and the statement made on March 20, 2012.

When viewed in the context of the facts presented, Appellant's statement that an attorney in an unrelated matter advised him not to speak to police cannot reasonably be construed as an expression of a desire for the presence of counsel during questioning. Quite the contrary is true, as the record demonstrates that Appellant was aware of the benefit of having counsel present when questioned by police, yet he displayed a willingness to discuss Jaques's murder, reasoning that "there's no reason for a lawyer here." Id. at 16. Appellant never made an unambiguous request for counsel and did not, at any time, indicate that the questioning should cease so that legal consultation could occur. Further, as noted by the trial court, Appellant knew how to invoke his right to counsel as he did so after the interview concluded in connection with the police request that he submit to a voice stress test. Appellant is, therefore, not entitled to relief on this claim.[10]

### B. Suppression of March 20, 2012 Statement

Appellant next contends that the trial court violated his Sixth Amendment right to counsel by failing to suppress the statement he made to police on March 20, 2012, after he was handcuffed and arrested for the murder of Jaques[11] At this point in time, the

---

[10] As noted, the trial court also denied suppression of the November 11, 2011 statement on the ground that Appellant was not in custody. While Appellant asserts that he was a suspect on November 11, 2011, and that the police interrogated him to obtain incriminating statements, Brief for Appellant at 32, he does not suggest that his freedom was restricted in any way during the interview and does not dispute that he left the police station when the interview concluded. See Commonwealth v. Johnson, 42 A.3d 1017, 1028 (Pa. 2012) (holding that "a person is in custody for Miranda purposes only when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation") (internal citations omitted).

[11] The Sixth Amendment right to counsel is offense-specific and cannot be invoked once for all future prosecutions; it only attaches at the commencement of prosecution, i.e., when criminal proceedings are initiated by charge, preliminary hearing, indictment, (continued…)

autopsy report had been released, which indicated that the cause of Jaques's death was blunt force trauma and that the manner of death was homicide. While still handcuffed after the arrest, Detective Clarkson read Appellant Miranda warnings and he indicated that he understood his rights.[12] When asked if he wanted to make a statement, Appellant responded, "I'll answer whatever you want, you know, I could care less. I already told you that." Interview Transcript, Mar. 20, 2012, at 3. Consistent with the two previously recorded statements provided to police on November 7, 2011, and November 11, 2011, Appellant reiterated that he had "popped" Jaques for defecating on the carpet, grabbed him by his ear in an effort to get him upstairs to the bathroom to clean up, left him in the bathtub alone, discovered Jaques unresponsive in the bathtub minutes later, and subsequently went to the neighbor's house for help. Id. at 6-20. When the detective confronted Appellant with the findings in the autopsy report, he denied any physical abuse or wrongdoing. Id. at 22-28. At the end of the interview, the detective told Appellant what was going to happen following his arrest, to which he responded that his attorney was Clarence Allen, and that he had just seen him at the corner barber shop. Id. at 27.

---

(…continued)
information, or arraignment. Commonwealth v. Keaton, 45 A.3d at 1065 (citing McNeil v. Wisconsin, 501 U.S. at 175). The purpose of the Sixth Amendment right to counsel is to protect the accused during critical confrontations with the government, after the adverse positions of government and the defense have solidified regarding a particular alleged crime. Id. (citations omitted).

[12] The well-known and often-cited Miranda warnings caution that the accused has the right to remain silent, that anything he says can and will be used against him in court, and that the accused has the right to consult with counsel and to have counsel present during interrogation; if he is indigent, counsel will be appointed for him. See Miranda, 384 U.S. at 467-69, 471-72.

Appellant acknowledges that Detective Clarkson provided him with <u>Miranda</u> warnings, but contends that he was denied his Sixth Amendment right to counsel because Detective Clarkson "failed to advise [him] that even if he talked to police, he could stop the interrogation at any time and request an attorney." Brief of Appellant at 33. Absent such specific direction, Appellant claims, his waiver of the right to counsel was invalid as it was not knowingly made. The Commonwealth summarily refutes this claim, emphasizing that Detective Clarkson advised Appellant of his <u>Miranda</u> warnings and Appellant waived those rights expressly prior to making his statement to police.

The trial court agreed with the Commonwealth, holding that Appellant's recorded statement given to police on March 20, 2012 did not violate his Sixth Amendment right to counsel. It found that when Appellant was given his <u>Miranda</u> warnings, he indicated that he understood them, and when asked whether he wanted to give a statement, replied, "I'll answer whatever you want, you know. I could care less. I already told you that." Transcript of March 20, 2012 Interview, at 3. The trial court concluded that this commentary established that Appellant acknowledged his right to counsel and validly waived the same.

As before, we conclude that the facts as found by the suppression court are supported by the record and the legal conclusions drawn from those facts are correct. The record demonstrates that Appellant was informed of his right to counsel and, nevertheless, indicated that he wanted to give a statement in the absence of counsel. Nothing more is required under the law.

## V. Suppression of Physical Evidence

Appellant contends the trial court erred by denying his motion to suppress physical evidence seized from his residence after several officers entered and searched the premises without permission and without a valid warrant. Conceding that a valid warrant

was obtained later that afternoon, Appellant argues that the items of evidence seized pursuant to the valid warrant (*i.e.,* pieces of a leather belt, photos of the crime scene, a bong and baggie containing a green leafy substance, clothing, paperwork, a mobile phone, and a laptop) must be suppressed because they were tainted by the initial illegal entry into his home.[13]

The Commonwealth refutes Appellant's claim as belied by the record, contending that the only entry into his home prior to execution of the valid warrant was permissible as it was limited in scope to confirm there were no children left alone in Appellant's home and to obtain diapers for Jaques's sister, who was in the care of Appellant's neighbor. It concludes that even if the prior entries into the home were illegal, the subsequent seizure of physical evidence was independent of any illegal police action and, thus, not subject to suppression. See Brief for Appellee at 26 (citing Segura v. United States, 468 U.S. 796 (1984) (holding that the Fourth Amendment does not require suppression of evidence seized from a private residence pursuant to a valid search warrant, notwithstanding an earlier illegal entry by police, where the warrant was issued on information obtained independently from the illegal entry)).

The trial court held that the physical evidence seized from his home was admissible because: (1) no evidence was taken until a valid search warrant was obtained; and, (2) the search warrant issued was supported by probable cause. The trial court credited the suppression testimony presented by the police officers who secured the crime scene, which established that no physical evidence was seized from Appellant's home prior to the issuance of a valid search warrant. N.T. (Suppression Hearing), Oct. 23, 2015, at 27, 32, 37, 46, and 51. Moreover, the court concluded, the affidavit of

---

[13] Appellant does not demonstrate how these items were utilized by the Commonwealth to convict him of first degree murder.

probable cause to search was not premised upon any information gleaned by the officers prior to issuance of a valid search warrant.[14] It further held that considering the suspicious nature of the child's death, probable cause existed for the magistrate to issue the warrant based upon the information contained in the affidavit.

Once again, we conclude that the facts as found by the trial court are supported by the record and the legal conclusions drawn therefrom are correct. To reiterate, the record establishes that Officer Roy Kohler heard Appellant state that he had been caring for more than one child and entered Appellant's residence prior to obtaining a warrant for the limited purpose of determining whether Appellant had left any additional children alone in the home. N.T. (Suppression Hearing), Oct. 23, 2012, at 14. He did not move or collect evidence at that time and did not take any photographs. Id. at 15, 27.

---

[14] The Affidavit of Probable Cause used to obtain the search warrant contained the following information:

> On 11/7/11 at approx. 1425 hrs, York City Police were dispatched to 169 W. Maple St for a cardiac arrest of a 2 year old victim. Upon arrival, officers spoke with the father, Aric Woodard, who stated that his child, Jaques, was the victim.
>
> Woodard advised officers that he and Jaques live at 140 W. Boundary Ave. They were both inside their residence shortly before 911 was called. Woodard stated that Jaques had defecated in the pants that he was wearing, so Woodard told Jaques to go upstairs and get in the bath tub. Woodard stated that he went upstairs to check on Jaques, and found Jaques with his head down between his legs, in water, in the bathtub, and unresponsive. Jaques was transported to York Hospital and pronounced dead.
>
> Based on the above information which I believe to be true and correct, I respectfully request that a search warrant be issued to obtain photographs and evidence from 140 W. Boundary Ave.

Affidavit of Probable Cause, dated Nov. 11, 2011.

Moments later, Officer Kohler again briefly entered the residence because a neighbor caring for Jaques's baby sister asked if she could retrieve diapers from the home. Id. at 16. Again, no evidence was moved or collected. Id. at 27. At 5:20 p.m. on the afternoon of the murder, officers obtained a warrant, but realized that the address on the warrant was that of the neighbor's home from which the 911 call was made, and not Appellant's residence. Id. at 43, 56. The officers remedied the error by obtaining a second search warrant listing the correct address. The officers did not conduct any search of Appellant's residence or seize evidence until after the corrected search warrant was executed at 5:40 p.m. Id. at 43, 46, 59.

Accordingly, the trial court was correct in holding that the search of Appellant's residence and subsequent seizure of evidence comported with the Fourth Amendment because it did not occur until after police obtained a valid warrant. Moreover, as referenced by the trial court, the information contained in the affidavit of probable cause was based on the suspicious nature of the child's death and Appellant's statements made at the crime scene, which was independent from any evidence purportedly viewed by police during a previous entry into Appellant's residence. Under these circumstances, Appellant's claim fails.

## VI. Denial of Supplemental Pretrial Motions

In his next claim, Appellant contends that the trial court erred by denying his supplemental omnibus pretrial motion. See Brief of Appellant at 38. Appellant fails to identify the substance of the particular pretrial motion at issue and sets forth no argument whatsoever in support of this claim. The Commonwealth argues that the claim is, therefore, waived, and we agree. See Wirth v. Commonwealth, 95 A.3d 822, 837 (Pa. 2014) (holding that "[w]here an appellate brief fails to . . . develop an issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of an

appellate court to formulate appellant's arguments for him.") (internal quotations omitted); see also Pa.R.A.P. 2119(a) (providing that appellate briefs must contain "such discussion and citation of authorities as are deemed pertinent").

## VII. Torture Aggravating Circumstance

Appellant raises two distinct, but related, issues regarding the aggravating circumstance of torture pursuant to 42 Pa.C.S. § 9711(d)(8) (providing that "[t]he offense was committed by means of torture"). First, he contends that the trial court erred by denying his pretrial motion to quash the aggravating circumstance of torture for lack of evidence. Second, Appellant submits that the Commonwealth failed to prove torture beyond a reasonable doubt during the penalty phase of trial.

To establish that a murder was committed by means of torture, the Commonwealth must demonstrate that the defendant "intentionally inflicted . . . a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." Commonwealth v. Powell, 956 A.2d 406, 425 (Pa. 2008) (quoting Commonwealth v. Karenbauer, 715 A.2d 1086, 1099 (Pa. 1998)). The intent to torture may be proven from the circumstances surrounding the killing. Commonwealth v. Cox, 686 A.2d 1279, 1289 (Pa. 1996). The factors to consider in determining whether the torture aggravator applies include, but are not limited to: (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode. Powell, 956 A.2d at 425 (citing Commonwealth v. Ockenhouse, 756 A.2d 1130, 1137 (Pa. 2000)). Finally, in reviewing a jury's determination that an offense was committed by means of torture, we must examine the evidence in the light most favorable

to the Commonwealth and draw all reasonable inferences in its favor. Powell, 956 A.2d at 425.

As background for the torture claim, we note that on July 12, 2013, the trial court conducted a pretrial hearing on Appellant's motion to quash the torture aggravator. The Commonwealth presented the expert medical testimony of Dr. David Fowler, who testified that after reviewing Dr. Land's autopsy report and autopsy photographs, he agreed that Jaques's death did not result from accidental drowning, but rather from homicide by blunt force trauma. N.T. (Pretrial Hearing), Jul. 12, 2013, at 29. Dr. Fowler noted there were twenty to thirty impacts to Jaques's body, both fatal and nonfatal, which occurred within hours of each other and which would cause Jaques great pain. Id. at 23-27. He explained that the greatest amount of pain would have resulted from the lacerated liver, which would render it extremely painful for Jaques to breathe. Id. at 27. Dr. Fowler found that the liver injury and the head injury were the most fatal, id. at 31, that the head injury would have rendered Jaques unconscious, id. at 33, and that he could not determine the particular order in which the various injuries were inflicted. Id. at 32.

Relating to the penalty phase portion of the claim, we reiterate that the Commonwealth did not present evidence during the penalty hearing, but rather incorporated the trial record in support of the torture aggravator. N.T. (Penalty Phase), Oct. 28, 2013, Volume VI, at 1323.[15] Also at the penalty hearing, Appellant called Dr.

---

[15] As noted supra, Dr. Land testified at trial that he conducted Jaques's autopsy and detailed the multitude of injuries that Jaques suffered over nearly his entire body, many of which were inflicted within hours of his death. Dr. Land opined that the most significant injury to the torso was the lacerated liver, which would have caused severe pain, nausea, vomiting, and loss of bowel control, and which had been inflicted several hours before Jaques died. N.T. (Trial), Volume IV, Oct. 22, 2013, at 927, 929. Finally, Dr. Land found that Jaques's severe brain injury would have rendered him unconscious, and happened at or about the time of death, as there was no evidence of healing. Id. at 927, 930.

Fowler (who had testified on behalf of the Commonwealth at the pretrial hearing) in an attempt to refute that the killing was committed by means of torture. Appellant elicited testimony from Dr. Fowler establishing that he could not identify, within a reasonable degree of medical certainty, when Jaques became unconscious from the beatings he endured. Id. at 1372.

Dr. Fowler, however, further testified during the penalty phase that although he could not determine the precise order of the wounds inflicted on the day of the murder, the injuries were inflicted within approximately a four-hour period, and that the lacerated liver was the only injury that showed the migration of white cells, which is an early sign of healing. Id. at 1368-71. Thus, consistent with Dr. Land's trial testimony, Dr. Fowler opined that the damage to Jaques's liver, which contributed to his death, would have occurred first. Id. at 1371. When asked when Jaques would have become unconscious from the liver injury, Dr. Fowler responded that he did not know how quickly the blood loss from the lacerated liver would have occurred, but opined that "it took long enough because there is time for the polymer to actually infiltrate the actual injury. So it was not a rapid death." Id. at 1372. Dr. Fowler also testified that Jaques's head injury would likely render him unconscious, but could not state with certainty when that injury occurred. Id. at 1372-74. On cross-examination by the Commonwealth, Dr. Fowler reiterated his prior testimony that the injury to Jaques's liver would cause severe pain. Id. at 1376-77. He explained that from the moment the liver was lacerated, Jaques would suffer severe pain each time he took a breath, resulting in an absolutely rigid abdominal cavity that was filling with blood. Id. at 1376-78.

In both of the torture-related issues, Appellant harkens back to the same theme he relied upon, albeit unsuccessfully, in his challenge to the sufficiency of the evidence in Issue I, supra, i.e., that there was no medical evidence establishing when Jaques was

rendered unconscious from Appellant's repeated beatings. He infers from this purported lack of evidence that it would be mere speculation to conclude that Jaques suffered a considerable amount of pain and suffering that was unnecessarily heinous because "[p]ain cannot be felt by a person who is unconscious." Brief for Appellant at 41. Appellant concludes that absent evidence that Jaques was conscious when the myriad of injuries were inflicted, the Commonwealth failed to meet its burden of proving the aggravating circumstance of torture beyond a reasonable doubt. For this same reason, he argues, the jury should not have even considered the torture aggravator during deliberations.

The Commonwealth contends that Appellant's claims lack merit. First, it submits that the trial court was correct in denying the pretrial motion to quash the torture aggravator based on Dr. Fowler's testimony at the July 12, 2013 pretrial hearing. See Commonwealth v. Buck, 709 A.2d 892, 896 (Pa. 1998) (holding that the trial court may submit an aggravator for the jury's consideration as long as it is supported by any evidence; the Commonwealth has no pretrial burden of proving aggravating circumstances); see also 42 Pa.C.S. § 9711(c)(1)(i) (providing that the court shall instruct the jury regarding aggravating circumstances for which there is "some evidence"). The Commonwealth maintains that this meager showing of "any" or "some" evidence necessary to refute a pretrial challenge to an alleged aggravating circumstance was clearly satisfied here as Dr. Fowler's pretrial testimony explained the severity of Jaques's multiple injuries and demonstrated that each blow inflicted would have caused the defenseless toddler significant pain, beyond that required to kill, thereby satisfying the legal definition of torture. Accordingly, it concludes, the trial court did not err by denying Appellant's pretrial motion to quash.

Second, the Commonwealth refutes Appellant's claim of insufficient evidence demonstrating torture during trial. It contends that the torture element is premised upon Appellant's willful, deliberate and prolonged beating of Jaques, which resulted in blunt force trauma and internal hemorrhaging to the child's brain, torso, and internal organs, which ultimately led to his death. It asserts that this case is akin to Commonwealth v. Smith, 675 A.2d 1221 (Pa. 1996) (plurality), where this Court found sufficient evidence of torture.[16] In Smith, the defendant was convicted of first degree murder after he fatally beat the five-month-old baby who was in his care. The expert medical testimony opined that the baby's brain had suffered trauma from six to eight blows to the head, that there were several bruises to the head, and that the baby's clavicle was broken, which would have caused the infant pain every time he was picked up, shaken, or struck. Id. at 1227. The medical expert testimony further established that the baby experienced substantial pain during the beating, causing more pain than other causes of death such as shooting or stabbing. Id. Finally, the expert opined that between fifteen minutes and one hour elapsed before the baby stopped feeling pain. Id. This evidence, markedly similar to the evidence in the instant case, the Commonwealth asserts, was deemed sufficient to demonstrate torture.

The trial court agreed with the Commonwealth and rejected Appellant's claims, holding there was ample evidence at both the pretrial and penalty phase stages of the case to allow the jury to consider torture as an aggravating factor and to conclude that there was sufficient evidence in support thereof. Relating to the pretrial stage, the trial court cited extensively from the pretrial hearing testimony of Dr. Fowler who explained that he observed between twenty and thirty independent impacts to Jaques's body, both

---

[16] None of the responsive opinions filed in Smith disagreed with the analysis of the torture issue set forth in the Opinion Announcing the Judgment of the Court.

fatal and nonfatal, some of which, including the lacerated liver, would have been extremely painful to the young victim. N.T. (Pretrial Hearing), Jul. 12, 2013, at 23, 25-26.[17] The trial court emphasized that Dr. Fowler testified again during the penalty phase of trial, and his testimony remained the same. Trial Court Opinion dated Jul. 22, 2014, at 14 (citing N.T. (Penalty Phase), Oct. 28, 2013, Volume VI, at 1365-1383). The trial court concluded that ample evidence existed to show the number of injuries, the amount of pain suffered by Jaques as a result of those injuries, and the intentional nature of the injuries, thereby establishing beyond a reasonable doubt that the killing was committed by means of torture.

Applying our settled jurisprudence to the facts presented, we conclude that the trial court's analysis was correct. When viewed in the light most favorable to the Commonwealth, as verdict winner, there is sufficient evidence for the jury to conclude that Appellant intentionally inflicted a considerable amount of pain and suffering upon Jaques that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity, beyond a mere intent to kill. It is beyond cavil that the sheer number of injuries inflicted upon nearly every surface of Jaques's body, both fatal and nonfatal, over the course of hours, would cause unimaginable pain to the young child who had been placed in Appellant's exclusive care. In addition to the myriad of non-fatal blows to Jaques's body, and several hours before Jaques died, Appellant struck the toddler's abdominal area with such force that his liver was nearly lacerated completely, which caused him significant pain, nausea, vomiting, and loss of bowel control. The jury could infer from this evidence that Jaques endured severe pain from the lacerated liver and the various contusions and

---

[17] The trial court also noted that because there was an additional aggravating circumstance that was undisputed, *i.e.*, that the victim was a child under twelve years of age, 42 Pa.C.S. § 9711(d)(16), there is no question that the case was properly designated a capital case even absent the torture aggravator.

abrasions until he was rendered unconscious hours later by Appellant's final fatal blow to Jaques's head. See N.T. (Trial), Volume IV, Oct. 22, 2013, at 27, 29-30 (referencing Dr. Land's opinion that Jaques suffered a lacerated liver several hours before death, which caused substantial pain and discomfort, and that a blow to Jaques's head at or near the time of death rendered him unconscious). Rather than seeking immediate medical attention for the ailing toddler, Appellant left Jaques in the bathtub to succumb to his injuries. We conclude that this evidence is sufficient to establish that Jaques's killing was committed by means of torture.

This Court has repeatedly found sufficient evidence of torture in cases, like the instant case, where an individual entrusted with the care of a child murders that child in a manner that inflicts considerable pain and suffering beyond that required to cause death. See Chambers, 980 A.2d at 55 (sustaining jury's finding of torture where the defendant fatally beat the three-year old victim, forcefully threw her into a radiator, and then catapulted the child behind a bed where she was left to suffocate to death); Powell, 956 A.2d at 426 (finding sufficient evidence of torture where the defendant fatally beat his six-year-old son, causing non-fatal injuries as well as disfiguring his face and irreparably damaging his brain, which caused seizures that resulted in his death by asphyxiation); Karenbauer, 715 A.2d at 1099 (upholding the torture aggravator where the defendant fatally stabbed his child to death by inflicting eighteen stab wounds because had the defendant simply intended to kill the victim, he could have used his size advantage and knife to do so far more expeditiously); and Smith, 675 A.2d at 1233 (plurality) (holding there was sufficient evidence of torture where the defendant fatally beat a five-month-old baby who was in his care, causing severe head injury and a broken clavicle, which would have caused the infant pain every time the infant was picked up).

Finally, having established that evidence supporting the torture aggravating circumstance existed during the pretrial stage of this case, we reject Appellant's contention that the trial court erred in denying his pretrial motion to quash the torture aggravator.  See Buck, 709 A.2d at 896 (holding that the trial court may submit an aggravator for the jury's consideration as long as it is supported by any evidence); see also 42 Pa.C.S. § 9711(c)(1)(i) (providing that the court shall instruct the jury regarding aggravating circumstances for which there is "some evidence").

**VIII. Death-Qualified Jury**

Appellant's next claim is that the trial court erred by denying his motion to preclude the Commonwealth from seeking the death penalty.  He bases his claim on the contention that his right to a fair and impartial jury as guaranteed by the Pennsylvania and United States Constitutions was violated by the procedure employed to "death-qualify" his jury.  "Death-qualifying" a jury has been defined as the process of asking questions during *voir dire* to identify individuals who object to the death penalty and cannot impose a death sentence under any circumstance and excluding those persons from the jury. Commonwealth v. Wright, 961 A.2d 119, 149 (Pa. 2008).  Appellant contends that the death qualification process predisposes jurors toward a guilty verdict because it requires the jury to assume the defendant's guilt and results in the empanelling of jurors less likely to consider mitigation evidence.  He further contends that social science data provides that death qualification substantially reduces diversity in jury race, gender, and certain religious affiliations, thereby rendering the jury more conviction-prone.  He acknowledges that the United States Supreme Court has discounted the social science upon which he relies in Lockhart v. McCree, 476 U.S. 162 (1986), but contends that the High Court failed to consider the studies collectively and disregarded sound academic principles.

The Commonwealth contends that Appellant's claim fails because both this Court and the United States Supreme Court have repeatedly upheld the procedure utilized to death qualify a jury. It further emphasizes that the social science data relied upon by Appellant in his brief to this Court, which has been disregarded by the United States Supreme Court in McCree, was never presented to the trial court below.

The trial court denied Appellant relief on this claim, finding that the law of Pennsylvania was clear in that it sanctioned the use of death qualified juries in capital cases. See Commonwealth v. Wright, 961 A.2d at 149 (holding that the process of asking questions during *voir dire* to identify individuals who object to the death penalty and who cannot impose the death penalty under any circumstances and excluding those jurors from the venire is a proper and necessary procedure to ensure a fair trial). Relying on this Court's decision in Wright, the trial court opined that the process of death qualification does not deprive a defendant of a fair and impartial jury from a cross-section of the community and does not create a conviction-prone jury. Accordingly, the trial court found that it did not err by adhering to governing precedent.

We agree as both this Court and the United States Supreme Court have consistently rejected the identical constitutional challenges to a death-qualified jury as set forth by Appellant herein. See McCree, supra (holding that the exclusion of a group of individuals, defined solely by their shared attitude that they could not follow the law and impose the death penalty under any circumstances, may be excluded from jury service without violating the "impartial jury" and "fair cross-section" clauses of the Sixth Amendments to the United States Constitution); Wright, 961 A.2d at 149 (holding that death-qualifying the jury is a proper and necessary procedure to ensure a fair trial and does not deprive the defendant of a fair and impartial jury from a representative cross-section of the community or result in a jury inclined to impose death in capital

murder prosecution); Commonwealth v. Marinelli, 690 A.2d 203, 216 (Pa. 1997) (acknowledging that "death qualification process is consistent with the guarantees of a fair trial"); Commonwealth v. Morris 684 A.2d 1037, 1040 n.2 (Pa. 1996) (holding that "[t]his Court has repeatedly held that the death qualification process is consistent with the guarantees of a fair trial"); see also Commonwealth v. Padilla, 80 A.3d 1238, 1275 (Pa. 2013) (rejecting the defendant's claim that the death qualification procedure creates juries predisposed to imposing the death sentence because the defendant failed to advance a specific claim that the jury in his case was predisposed toward the death penalty, and, instead, relied upon published studies of a group of social scientists). As Appellant has failed to demonstrate why we should deviate from this well-settled law and has identified no particular circumstance distinguishing his case from those cited herein, the trial court did not err in denying his motion to preclude the Commonwealth from seeking the death penalty based on the death qualification of the jury.

### IX. Separate Juries for Guilt and Penalty Phases

Relying in part on his previous argument alleging the unfairness inherent in death-qualified juries, Appellant contends that the trial court erred by denying his request to have separate juries serve during the guilt and penalty phases of trial. Presuming that a death-qualified jury is predisposed to convict and impose the death penalty, Appellant asserts, without citation to authority, that there is no legitimate reason for jurors who heard the guilt phase of trial to continue to be jurors during the penalty phase. He argues that the additional costs or the logistics of having two juries are inadequate reasons to deny a capital defendant a fair and impartial jury. Appellant concludes that the only rationale for having the same jury during the guilt and penalty phases of trial is to make it easier for the Commonwealth to convict.

The Commonwealth counters that there is no merit to Appellant's claim because the Sentencing Code requires expressly that the same jury decide both guilt and penalty. See 42 Pa.C.S. § 9711(a)(1) (providing that "[a]fter a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment"). It relies on case law from this Court holding that Section 9711(a)(1) requires that the jury that rendered a verdict of murder in the first degree also determine whether the appropriate sentence is life imprisonment or death. Similarly relying on Section 9711(a)(1), the trial court denied Appellant relief on this claim, holding that the law on this issue is clear that the same jury adjudicates guilt and penalty in a capital murder case.

We find no error in the trial court's holding as it correctly sets forth the law of this Commonwealth. See Commonwealth v. Mattison, 82 A.3d 386, 397 (Pa. 2013) (holding that "[t]his Court has repeatedly interpreted Section 9711(a)(1) as providing that 'the same jury which renders the verdict of murder in the first degree is the same jury which is to determine whether the sentence is to be death or life imprisonment'") (quoting Commonwealth v Bryant, 574 A.2d 590, 595 (Pa. 1990)); Commonwealth v. Haag, 562 A.2d 289 (Pa. 1989) (same); Commonwealth v. Williams, 522 A.2d 1058 (Pa. 1987) (same).

## X. Challenge to Penalty Phase Jury Instructions
## XI. Challenge to the Death Penalty as Cruel and Unusual

The next two issues are addressed together as Appellant has failed to support them with any argument in his appellate brief. See Brief for Appellant at 48. First, Appellant contends that the trial court erred in denying his challenge to the Pennsylvania jury instructions relating to the death penalty because they failed to provide for the

necessity of a non-death-qualified jury.   Second, he maintains that the trial court erred by denying his challenge to the death penalty on the grounds that it violates the cruel and unusual punishment provisions of the Pennsylvania and United States Constitution. Having set forth no argument at all on either of these issues in his brief to this Court, the Commonwealth contends that both issues are waived.   The trial court addressed the issues on the merits and rejected them.

We agree with the Commonwealth that the issues are waived for failing to present any argument in support thereof. See Wirth v. Commonwealth, 95 A.3d at 837 (holding that "[w]here an appellate brief fails to . . . develop an issue in any other meaningful fashion capable of review, that claim is waived.   It is not the obligation of an appellate court to formulate appellant's arguments for him.") (internal quotations omitted); see also Pa.R.A.P. 2119(a) (providing that appellate briefs must contain "such discussion and citation of authorities as are deemed pertinent").

### XII. Constitutional Challenge to Death Penalty Statute

Appellant contends that the trial court erred by denying his motion to challenge the constitutionality of Sections 9711(a)(2) and (c)(2).[18]   Rather than explaining why such

---

[18] Section 9711(a)(2) and (c)(2), respectively, provide:

> In the sentencing hearing, evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible.   Additionally, evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed.   Evidence shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e), and information concerning the victim and the impact that the death of the victim has had on the family of the victim.   Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).
>
> *                              *                              *

(continued…)

provisions fail to pass constitutional muster, Appellant's argument in support of this claim appears non-responsive to the statement of the issue. See Brief of Appellant at 48. Specifically, Appellant reiterates his contention that a death qualified jury and the process by which it is empanelled violated his constitutional right to a fair and impartial jury - a claim we previously rejected herein at Issue VIII. He further reiterates his argument discussed in Issue IX regarding why the same jury should not adjudicate both guilt and penalty in a capital murder case and maintains, without referencing the record, that the jury was informed of the aggravating circumstance of torture during *voir dire*, thereby predisposing the jury to convict him. Id.

The Commonwealth contends that Appellant's challenge to the death penalty statute fails because the statute has consistently been found to be constitutional. The trial court agreed that Appellant's claim lacked merit, holding that our death penalty statute has survived constitutional challenge. As Appellant has failed to develop the claim as framed, we find that it is waived for purposes of appellate review. See Wirth, 95 A.3d at 837; Pa.R.A.P. 2119(a).

### XIII. Statutory Review

Having rejected all of Appellant's claims for relief, we are required to affirm the sentence of death unless we determine that it "was the product of passion, prejudice or any other arbitrary factor" or "the evidence fails to support the finding of at least one

---

(…continued)

    The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family. The court shall also instruct the jury on any other matter that may be just and proper under the circumstances.

42 Pa.C.S. § 9711(a)(2), (c)(2).

aggravating circumstance." 42 Pa.C.S. § 9711(h)(3)(i),(ii). First, we conclude that the sentence of death was not the product of passion, prejudice, or any other arbitrary factor, but rather was based upon the evidence presented. Second, the evidence was sufficient to support both of the aggravating circumstances found by the jury, *i.e.*, that the victim was a child under twelve years of age, 42 Pa.C.S. § 9711(d)(16), and that the offense was committed by means of torture. Id. § 9711(d)(8).

Accordingly, we affirm the verdict and sentence of death. [19]

Mr. Justice Eakin, Madame Justice Todd, and Mr. Justice Stevens join this opinion.

Mr. Chief Justice Saylor files a dissenting opinion.

---

[19] The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).