J-A11022-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| KNOWLEDGE DANTE FRIERSON | : | |
| | : | |
| Appellant | : | No. 1241 MDA 2018 |

Appeal from the Judgment of Sentence Entered February 20, 2018
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0001063-2016

BEFORE: BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY OLSON, J.: **FILED JULY 31, 2019**

Appellant, Knowledge Dante Frierson, appeals from the judgment of
sentence entered on February 20, 2018, following his jury trial convictions for
third-degree murder, aggravated assault (attempt to cause serious bodily
injury), aggravated assault (attempt to cause serious bodily injury with a
deadly weapon), possession of an instrument of crime, tampering with
physical evidence, and related firearm offenses.[1]  We affirm.

The trial court set forth the facts of this case as follows:

On October 13, 2015, at approximately 9:00 p.m., Keith Freeman,
Jr. (Freeman) was in his home [on Brandon Avenue in Lycoming
County] with his children.  His girlfriend, Katrina Washington
(Washington), was at work.  Freeman testified that his son told
Freeman that someone was at the door.  Freeman did not open

---

[1]  18 Pa.C.S.A. §§ 2502(c), 2702(a)(1), 2702(a)(4), 907, and 4910,
respectively.  At a separate bench trial following the jury trial, the trial court
also found Appellant guilty of persons not to possess a firearm and carrying a
firearm without a license.  18 Pa.C.S.A. §§ 6105 and 6106, respectively.

the door, but he saw an individual [(Appellant)] on the front porch [whom] he did not recognize. [Appellant] asked for a person whose name Freeman also did not recognize. Freeman told [Appellant] he had the wrong house, and [Appellant] walked [away in a westerly direction].

Freeman testified that [Appellant's] demeanor made him nervous because [Appellant] did not look him in the eye and had his hands in [the pockets] of his [hooded sweatshirt]. After [Appellant] left, Freeman decided he did not want Washington to walk home from work. Freeman called his mother and aunt and asked one of them to pick up Washington. His aunt, Carolyn Barr (Barr), said that she would pick up Washington. Freeman called Washington and told her Barr would pick her up after work.

[Appellant] knocked on the door again, and Freeman told him again that he had the wrong address. Freeman testified that [Appellant] insisted that he had the right address and that someone sent him. Freeman also testified that after the second encounter, he ran upstairs and got his gun.

When Barr and Washington arrived at the house, they noticed [Appellant] was waiting around outside the house and was staring at them. Freeman testified that he also called his friend Tyson Bolden (Bolden). Bolden came to Freeman's house shortly after Washington and Barr arrived, and Freeman believed Bolden brought a handgun with him.

Freeman, Washington, Barr, and Bolden discussed the situation in the house. When the time came for Barr to leave, Freeman and Bolden decided to walk Barr back to her car. As they were walking down the steps of the house, Freeman testified that Barr screamed his nickname, Dump, and suddenly he and [Appellant] were face to face. Washington, who was inside the house, also testified that she heard Barr scream[, "]Dump[,"] followed by gunshots. Freeman and [Appellant] struggled over [Appellant's] gun as they fell to the ground near the bottom of the steps, and a shot went off. Freeman testified that he jumped off of [Appellant] and that [Appellant] shot again. [Appellant] and Freeman then exchanged gunfire as Freeman backed away east [] and [Appellant] headed west []. Freeman testified that he fired about three or four shots, and he thought [Appellant] fired about six shots. Freeman testified that he threw his weapon into the bushes and that he saw [Appellant] limping in an unnamed alley after the shooting

- 2 -

stopped. At some point during the gunfire exchange, a bullet struck Barr in the torso and she died soon after. Dr. Michael Johnson (Johnson), the forensic pathologist who performed Barr's autopsy testified that the cause of Barr's death was a single gunshot wound to her abdomen. Johnson concluded that the manner of her death was homicide.

Multiple eyewitnesses testified to the events that occurred on October 13, 2015. Robert Smith lived on [] Cherry Street, just around the corner from [] Brandon Avenue. At approximately 9:30 p.m. he heard between 10-12 gunshots. Smith testified that there were one or two gunshots at first, followed by a brief pause and then more gunshots after that, [which he described as being] "almost like a panic fire." He believed that the gunfire sounded like it was coming from [two] different guns, one smaller caliber and one slightly larger caliber. After calling 911, Smith testified that he heard a male voice yelling for help that sounded like it was coming from [Freeman's street].

Kathleen Mitsdarfer (Mitsdarfer), lived [on Freeman's street]. She testified that she was awakened by the sound of gunfire, heard three shots followed by a pause and then a few more. She said the shots were coming from the west and that she looked out her bedroom window and saw a man with a silver gun in his right hand walking backwards in front of her house. Mitsdarfer testified that the man did not fire the gun while she was watching, and that he was walking quickly to the east down the middle of the street.

Theresa Bower (Bower) lived [on Freeman's street] close to where the unnamed alley [was located]. She testified that she heard gunshots and a woman screaming which caused her to look outside. Bower testified that she saw a man running down the alley with a gun and that he was limping.

Drew Barasky (Barasky) was living [on Freeman's street] at the time, and around 9:30 p.m. that night he heard gunshots. He then saw someone limping in the alleyway as if they were hurt, and shortly after that he heard someone screaming for help at the side of his house. In June 2016, Barasky and [Appellant] were both housed in the same block of the Lycoming County prison. Barasky testified that he and [Appellant] had a brief conversation regarding the night of the shooting. Barasky mentioned to [Appellant] that he lived in the area [] where the shooting occurred, and testified that [Appellant] told Barasky that

- 3 -

[Appellant] "got rid of the thing in the alley," which Barasky understood to mean the gun.

A few months after the shooting, Bruce Huffman (Huffman) discovered a bullet hole in a post on his back porch. Huffman lives [in the neighborhood], and can see [Freeman's Brandon Avenue residence] from his back porch. Huffman testified that the hole was on the east side of the post, and that there was a dent or small protrusion pushing out to the west side. He also testified that he had not heard any gunshots since the night of the shooting before he found the bullet in his porch.

At 9:30 p.m. on October 13, 2015[,] Officer Eric Houseknecht (Houseknecht) was dispatched to [Freeman's street] for shots fired and a victim on scene. Houseknecht was the first unit to arrive at the scene and he testified that he found Barr barely conscious and lying on the ground in front of [the subject residence] and Washington was crying on the porch. Officer Jordan Stoltzfus (Stoltzfus) also arrived to clear people from the scene. Stoltzfus was told that someone was crying for help behind a nearby residence, and he found [Appellant] lying on the ground with a gunshot wound. Stoltzfus testified that he collected two pairs of pants from [Appellant] that had been cut off by [Emergency Medical Services (EMS)] and that there was blood on the pants.

Officer Derrick Cummings (Cummings) was also called to the scene to perform a gunshot residue (GSR) kit on [Appellant]. He testified that he went to the ambulance to use a scanning electronic microscopy kit (SEMS) on [Appellant] to check for gunpowder residue. Cummings testified that the kit looks for residue on the hands, which would be left behind if someone shoots a weapon. Cummings received SEMS training at the [P]olice [A]cademy, and testified that any type of fluid or blood can cause a negative result on the test. He also stated that the hands that are being tested should not touch anything, such as clothing, because it could remove some of the residue. Cummings testified that after swabbing both [of Appellant's] hands, he placed the swabs into the kit and sealed it. He confirmed that a proper chain of custody was maintained and the kits are kept in a secure location.

Officer Joseph Ananea (Ananea) processed the crime scene []. He testified that he marked various items of interest as he did a

walk-through of the scene. Because the outside crime scene involved a shooting, he especially looked for ballistic evidence such as shell casings, bullets and bullet fragments, as well as blood. He testified that in addition to fresh pools of blood on Brandon Avenue, he found a pool of blood in the gravel stones where [Appellant] was found lying in the alleyway. Along the alleyway, Ananea testified that there were drag marks and disturbances in the gravel, as well as more blood in the stones and bloody leaves. At the end of the bloody trial, Ananea found a handgun in the alley next to a chain link fence. Ananea collected blood samples, the handgun, and took photographic evidence of the crime scene. He testified that he did not find any bullets or casings that night, and that revolver style guns do not eject casings, unlike semi-automatic weapons which do.

A few days later, Ananea was informed that there was a possible bullet strike on a tree [near the crime scene]. Ananea testified that he saw a fresh bullet strike on the eastern side of the tree and found tiny metal fragments imbedded into the tree. The tree was cut down in order to extract the bullet.

Lieutenant Arnold Duck (Duck) also processed the crime scene with Officer Ananea. Duck made a map of the scene after the walk-through and diagrammed where evidence was collected and the markers were placed. Duck also took measurements to be used for reconstructing the crime scene. Duck testified that the handgun recovered from the alleyway was a Ruger revolver. All [six] rounds had been fired, with all of the casings still intact but no bullets in the gun. Duck also testified that there was a lot of blood on the gun, mostly on the metal portion around the trigger and the barrel but barely any blood on the grip itself. He testified that he swabbed the gun for blood and DNA evidence, and that he could not find any fingerprints on the gun.

Duck called Agent Trent Peacock (Peacock) and advised him that there had been a shooting. Duck also told Peacock that there were two victims, one already deceased and the other seriously injured in the hospital. Peacock testified that he drove straight to the scene and met with Houseknecht and Stoltzfus. He then proceeded to the hospital, where he came into contact with [Appellant]. […] He testified that [Appellant's] hands had been bagged to protect any residue or other evidence that was on the hands. Peacock also testified that immediately after the bags were removed, [Appellant] stuck his hands under his hospital

gown and wiped them. Peacock asked him to stop and [Appellant] replied that his groin itched. Peacock asked [Appellant] if he had handled a gun, and [Appellant] responded that he did not want to talk to Peacock any longer. After [a] SEMS kit was completed, Peacock delivered it to R.J. Lee Group for analysis.

Peacock testified that the investigators found that [a] resident [on] Brandon Avenue, Shawn Silvis, had video cameras on the front of his house, and that he was able to recover a videotape of the events of that night. When Peacock reviewed the video, he saw that there was a person walking backward[s] down the street to the east with a gun. He later identified the individual as Freeman, and Freeman initially denied that he had a gun. Freeman later admitted to having a gun and told Peacock that he discarded the weapon in some bushes [near the scene].

Peacock also obtained a one-foot cut section of the tree in front of [the subject residence] that contained the embedded bullet. He testified that he and Duck and Ananea were able to extract a mushroomed bullet from the tree section and sent it to the ballistics lab. He also met with Huffman to observe the bullet hole in Huffman's porch post. He saw that the bullet had entered from the east side and dented the west side, and Peacock extracted the bullet from the porch post. He testified that he believed that the bullets found in the tree and the porch were from Freeman's gun because both bullets entered on the east side and were heading west and Freeman was heading east while firing at [Appellant], who was going west.

Peacock testified that after [investigators] evaluated the preliminary evidence and determined that [Appellant] was a suspect, Peacock and Agent Kontz conducted a recorded interview of [Appellant at the Williamsport Police Station]. Peacock testified that [Appellant] was read his **Miranda**[2] rights and that [Appellant] did not appear to be under the influence of alcohol or any substance, and that [Appellant] appeared to understand the questions regarding his rights. Peacock also testified that no promises were made to [Appellant] in exchange for his statement, and that [Appellant's] statement was voluntarily and freely given.

_____

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

Peacock also testified that he and Agent Kontz took [Appellant] into custody and transported him from Harrisburg to Williamsport on the same day they interviewed [Appellant]. He testified that he did not discuss the charges with [Appellant] prior to the interview, that while he was taking [Appellant] into custody [he] only told [Appellant] that his arrest [] stemm[ed] from the shooting in which [Appellant] was injured, and that neither he nor Agent Kontz interviewed [Appellant] while he was being transported.

Veronica Miller (Miller), a forensic scientist at the Greensburg Regional Laboratory, performed a DNA analysis. She testified that she matched [Appellant's] DNA profile to the DNA samples she extracted from the blood stains on the Ruger revolver, the leaves and stones from the alleyway, and the rear steps of [the subject residence]. Miller was unable to perform a full analysis on the sample from the grip of the gun due to the complexity of the mixture.

Stephanie Hrico (Hrico), an employee of R.J. Lee Group's forensic science department, performed the GSR analysis. She testified that she has undergone SEMS and GSR analysis training. Hrico explained that in order for her to determine that a particle is highly specific to the discharge of a firearm, the particle has to have the correct chemical elements and the proper morphology. She testified that the three elements that make up gunshot residue are lead, barium, and antimony, and that the particle should be round or smooth-edged due to the intense heat from the discharge of the firearm. Hrico further explained that if a particle has all three chemical components, then that three-component particle is considered to be characteristic of gunshot residue. She testified that firing a weapon can also create two and one-particle [samples] as well, although those particles could come from other sources.

Hrico used a scanning electron microscope to determine what chemical elements were present and to see the actual shape of the particles. The kits she received contained samples from [Appellant's] left and right palms, and the backs of his left and right hands. Hrico testified that on the back of [Appellant's] right hand, she found one three-component particle that was characteristic of gunshot residue. She also found two and one-component particles in all [four] locations of [Appellant's] hands. She also testified that there are many factors that could

remove residue from the hands, such as hand washing, running, wiping hands off, adverse weather, and bodily fluids such as blood and sweat.

Sergeant Elwood Spencer (Spencer), a Pennsylvania State Police Trooper assigned to the Bureau of Forensic Services as a firearm and tool mark examiner, provided the ballistics analysis. He identified the handgun recovered from the alley as a Ruger Security 6 .357 magnum caliber revolver. He testified that the weapon was functional and had a routine trigger pull. Spencer also testified that he recovered two discharged and mutilated bullets, one from the tree and one from the porch post. He concluded that the two bullets were fired from the same weapon, but was unable to determine if they were fired from the Ruger revolver or a different gun. Spencer also identified that although he could not give a definitive answer as to the caliber of the bullets, he said that the weight and morphology would make it more likely that the caliber was .380 or .357 as opposed to a 9 mm.

Trial Court Opinion, 7/23/2018, at 2-10 (record citations omitted).

On November 2, 2017, a jury convicted Appellant of third-degree murder, aggravated assault (attempt to cause serious bodily injury), aggravated assault (attempt to cause serious bodily injury with a deadly weapon), possession of an instrument of crime, and tampering with physical evidence. In a separate bench trial following the jury's verdict, the trial court also convicted Appellant of persons not to possess a firearm and carrying a firearm without a license. On February 20, 2018, the trial court imposed an aggregate sentence of 26 to 60 years of imprisonment. This timely appeal resulted.[3]

_____

[3] Appellant filed a timely post-sentence motion on March 2, 2018. The trial court had 120 days to decide the post-sentence motion, but when it failed to decide the motion within that period, the motion was deemed denied by

On appeal, Appellant presents the following issues for our review:

1. Whether the trial court erred in denying a motion to suppress when [Appellant] had previously indicated to police that he did not want to speak to them without an attorney present?

2. Whether the [trial] court erred in failing to [hold a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)] when there is no national standard with regard to gunshot residue testing positive?

3. Whether the [trial] court erred in failing to give the missing witness [jury] instruction when the witness was an eyewitness to a homicide?

4. Whether the [trial] court erred in precluding testimony corroborating [Appellant's] explanation as to why he was at [Freeman's] residence?

5. Whether the jury's verdict is against the weight of the evidence?

_____

operation of law on July 1, 2018. *See* Pa.R.Crim.P. 720(B)(3)(a). When a post-sentence motion is deemed denied, the clerk of courts enters an order deeming the motion denied on behalf of the trial court and serves copies on the parties. *See* Pa.R.Crim.P. 720(B)(3)(c). A notice of appeal must be filed within 30 days of the entry of the order denying the post-sentence motion by operation of law. *See* Pa.R.Crim.P. 720(A)(2)(b). Here, the clerk of courts failed to enter an order disposing of Appellant's post-sentence motion on July 1, 2018. Instead, the trial court entered an opinion and order denying relief on July 23, 2018, outside the 120-day period, and Appellant filed a notice of appeal within 30 days of that order. This Court has previously determined that there is a breakdown in the judicial system when the clerk of courts fails to enter a deemed denied order under Pa.R.Crim.P. 720 and, thus, we may consider the merits of Appellant's current appeal. *See Commonwealth v. Patterson*, 940 A.2d 493, 498-499 (Pa. Super. 2007). After Appellant filed his notice of appeal, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(b) on August 31, 2018, which relied upon its July 23, 2018 decision.

6. Whether the [trial] court erred in failing to grant a hearing on the criminal case disposition of an eyewitness that occurred after Appellant's verdict when testimony [adduced at Appellant's trial suggested the witness had no deal with prosecutors]?

Appellant's Brief at 4-5 (complete capitalization and suggested answers omitted).

In his first issue presented, Appellant claims that the trial court erred in denying his suppression motion wherein he sought to preclude statements he made to police because he previously requested to speak with an attorney. Appellant's Brief at 15-19. More specifically, Appellant contends that when Agent Peacock attempted to question him while he was hospitalized with a gunshot wound, on October 13, 2015, the day of Barr's shooting, Appellant advised Agent Peacock that he wanted a lawyer, refused to answer questions, and sought to terminate the interview. *Id.* at 16. Appellant points out that "there were three [police] officers in the room [when Agent] Peacock began questioning [Appellant]." *Id.* at 17. Appellant does not seek to suppress information obtained during this encounter. Instead, he seeks to suppress information divulged six months later, when Agent Peacock obtained an arrest warrant, transported Appellant from Harrisburg to Williamsport, advised Appellant of his *Miranda* rights, and obtained a waiver of *Miranda* rights from Appellant before commencing with questions. *Id.* Thus, Appellant contends that "the issue becomes whether [Agent Peacock] had the right to request a waiver of his Fifth Amendment rights [under *Miranda*] knowing full well that [Appellant] had previously exercised those rights." *Id.* at 17.

The standard of review for the denial of a motion to suppress evidence is as follows:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the [legal conclusions of the trial courts] are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (internal brackets and citation omitted).

We previously determined:

> In *Miranda*, the United States Supreme Court established that an accused has the right to have counsel present **during custodial interrogations** under the Fifth and Fourteenth Amendments to the United States Constitution. [*Miranda*,] 384 U.S. at 474. This right to counsel is part of "a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011).
>
> *In Edwards v. Arizona*, [, 451 U.S. 477 (1981),] the [United States] Supreme Court addressed the consequences of a suspect's invocation of the right to counsel. The *Edwards* court held that "when an accused has invoked his right to have counsel present **during custodial interrogation**," police may not conduct further interrogations "until counsel has been made available to him,

unless the accused himself initiates further communication, exchanges, or conversations with the police." [*Edwards*,] 451 U.S. at 484–485. If police conduct further interrogations outside the presence of counsel, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

To trigger these protections, a defendant's request for counsel must be sufficiently clear "that a reasonable police officer would understand the statement to be a request for an attorney." *Davis* [*v. United States*], 512 U.S. [452,] 459, [(1994)].

*Commonwealth v. Champney*, 161 A.3d 265, 272 (Pa. Super. 2017) (*en banc*) (emphasis added); *see also Commonwealth v. Woodard*, 129 A.3d 480, 498 (Pa. 2015), *citing McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (To invoke the Fifth Amendment right to counsel effectively, the accused must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney **in dealing with custodial interrogation by the police**.") (original emphasis omitted; emphasis supplied).

Our Supreme Court has also stated:

The United States Supreme Court has held that, before law enforcement officers question an individual who has been in taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed. *Miranda*, 384 U.S. at 478–479. **However, these special procedural safeguards are required only where a suspect is *both* taken into custody and subjected to interrogation. *Commonwealth v. Bland*, 115 A.3d 854, 857**

- 12 -

(Pa. 2015) (*quoting **Rhode Island v. Innis***, 446 U.S. 291, 300 (1980)).

***Commonwealth v. Yandamuri***, 159 A.3d 503, 519–520 (Pa. 2017) (emphasis added); ***see also Bland***, 115 A.3d at 863 ("[T]o require a suspension of questioning by law enforcement officials on pain of an exclusionary remedy, an invocation of the ***Miranda***-based right to counsel must be made upon or after actual or imminent commencement of **in-custody** interrogation.") (emphasis added).

The appropriate test for determining whether a situation involves custodial interrogation is as follows:

> The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate ***Miranda*** warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.
>
> Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.
>
> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger custody, thus requiring ***Miranda*** warnings.

*        *        *

In order to be "in custody," a person must believe that he is not free to leave, and in order to be considered "interrogation," the questioning by the police must be expected to, calculated to, or likely to evoke admission.

*Commonwealth v. Mannion*, 725 A.2d 196, 200–201 (Pa. Super. 1999) (internal citations, brackets, and some quotations omitted).

The suppression court determined that when Appellant requested an attorney at the hospital six months prior to the interview at the Williamsport Police station, "he was not subject to a custodial interrogation, so the *Edwards* presumption would not apply[,]" but that, regardless, "a sufficient break in custody had occurred[.]" Trial Court Opinion, 7/28/2017, at 6. For the reasons that follow, we agree that *Edwards* does not apply since Appellant was not in custody at the hospital and, hence, was not subjected to custodial interrogation. We also agree that, even if Appellant were subject to custodial interrogation when he initially invoked his right to counsel during his hospital stay, the ensuing six-month period that elapsed before his next encounter with police officials precluded application of the *Edwards* rule. Because *Edwards* does not apply, the trial court correctly denied suppression.

While it is true that three police officers were present when Appellant was questioned in his hospital room, we conclude, under a totality of the circumstances, that the conditions and/or duration of the questioning did not become so coercive as to constitute the functional equivalent of arrest. When police interviewed Appellant at the hospital, they treated him as a shooting victim, not as a suspect. There was no evidence that police restrained or

- 14 -

transported Appellant against his will. In fact, Appellant voluntarily went to the hospital to receive treatment. The police questioning was brief, there were no threats or use of force, and Agent Peacock ended the interview immediately upon Appellant's invocation of counsel. *See* N.T., 4/17/2017, at 5-6. The officers left the hospital (without Appellant) when the interview terminated. Moreover, Appellant left town after receiving treatment and had no further contact with the officers for six months. Based upon this record, we conclude that Appellant was not in police custody when Agent Peacock briefly questioned him at the hospital.

In addition, Appellant has not cited legal authority, and our independent research has not revealed any, that the mere invocation of counsel during non-custodial police questioning triggers the rule announced in **Edwards**, *to-wit* that once an accused has been subject to custodial interrogation and has invoked his right to counsel pursuant to **Miranda**, police may not conduct further interrogations until counsel has been made available or the accused himself initiates further communication. Since only **custodial** interrogation triggers the rule announced in **Edwards**, and because the hospital interview did not qualify as a custodial interrogation, the police were not barred from later questioning Appellant without an attorney present given that he waived his rights under **Miranda**.

We also agree that the six-month period between Appellant's initial encounter with authorities at the hospital and his later interaction with police in Williamsport constituted a sufficient break in custody that allowed officers

- 15 -

to re-approach him to secure a waiver of his **Miranda** rights. The United States Supreme Court has held that the **Edwards** rule does not apply if a break in custody lasting at least 14 days has occurred prior to subsequent interrogation. **See Maryland v. Shatzer**, 559 U.S. 98, 110 (2010); **see also Champney**, 161 A.3d at 277-285 (discussing **Edwards** at length and concluding that five-month break between initial invocation of right to counsel and re-interrogation was sufficient to remove **Edwards**' presumption of involuntariness). Based upon the foregoing, we conclude the record supports the denial of suppression.

In his second issue presented, Appellant contends that the trial court erred by permitting the Commonwealth to present evidence regarding gunshot residue without a pre-trial hearing on novel scientific evidence pursuant to **Frye v. United States**, 293 F. 1013 (D.C. Cir. 1923). Appellant's Brief at 19-21. Appellant argues that "he was entitled to a **Frye** hearing as there is no national standard or consensus on what qualifies as a positive result for purposes of gunshot residue testing." **Id.** at 19. Appellant posits that the trial court agreed that there was no national standard. **Id.** at 20. As such, Appellant argues that expert gunshot residue testimony "should have been precluded [] based upon the fact that the expert could not tell whether [Appellant] fired the weapon[; a]ll she basically could testify to was that he was in the vicinity of a firearm being discharged." **Id.** at 20-21.

Our Supreme Court has held:

As a general rule, [an appellate court's] standard of review of a trial court's evidentiary ruling, including a ruling whether expert scientific evidence is admissible against a *Frye* challenge, is limited to determining whether the trial court abused its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Dengler*, 890 A.2d 372, 379 (Pa. 2005) (internal citations and quotations omitted).

Moreover, the *Dengler* Court determined:

Admissibility of the scientific evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs.

\*      \*      \*

The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential.

\*      \*      \*

*Frye* is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science. What constitutes novel scientific evidence has historically been decided on a case-by-case basis, and there is some fluidity in the analysis; indeed, science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date, or the strength of the proponent's proffer may affect the *Frye* determination.

- 17 -

*Id.* at 381-382.

Here, the trial court determined that gunshot residue testing "is not novel and holds general acceptance in the scientific community." Trial Court Opinion, 7/23/2018, at 14. We agree. Appellant does not provide citation to any Pennsylvania authority suggesting that courts have precluded gunshot residue testing from prior trials as novel evidence under *Frye*. Our independent research has not yielded any instances, either. Moreover, when arguing for a *Frye* hearing, counsel for Appellant acknowledged that "gunshot residue testing has been around for years." N.T., 9/8/2017, at 7. As gunshot residue testing is already scientifically established, a *Frye* hearing was unwarranted and we discern no trial court error or abuse of discretion.

In his third issue presented, Appellant claims the trial court erred by failing to issue a "missing witness" jury instruction regarding a purported eyewitness to the crimes, Tyson Bowman,[4] who did not testify at trial. Appellant's Brief at 21-24. Appellant argues that Bowman's testimony was important and not cumulative. *Id.* at 23. Appellant maintains that the uncalled witness was not accessible to him and essentially under the Commonwealth's control. *Id.* at 23-24. Thus, he claims he was entitled to a jury instruction regarding a missing witness.

---

[4] As explained below, the purported witness' name was in contention. Appellant claims the alleged witness' last name is "Bowman;" the Commonwealth and the trial court refer to him as "Bolden."

- 18 -

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." ***Commonwealth v. Leaner***, 202 A.3d 749, 782–783 (Pa. Super. 2019) (citation omitted). This Court has stated:

> The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [a]ppellant was prejudiced by that refusal.
>
> A missing witness instruction may be given in limited circumstances. When a potential witness is available to only one of the parties to a trial, it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference that it would have been unfavorable. However, this Court has clarified at least six circumstances where a party is not entitled to the missing witness adverse inference instruction:
>
>> 1. The witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth;
>>
>> 2. The testimony of such a witness is comparatively unimportant, cumulative, or inferior to that already presented;
>>
>> 3. The uncalled witness is equally available to both parties;
>>
>> 4. There is a satisfactory explanation as to why the party failed to call such a witness;
>>
>> 5. The witness is not available or not within the control of the party against whom the negative inference is desired; and
>>
>> 6. The testimony of the uncalled witness is not within the scope of the natural interest of the party failing to produce him.

- 19 -

***Commonwealth v. Miller***, 172 A.3d 632, 645–646 (Pa. Super. 2017) (internal citations and quotations omitted).

Here, the trial court explained:

The Commonwealth has been unable to locate Bolden, and has neither had the opportunity to interview nor speak with him. Any attempts to locate Bolden have undoubtedly been complicated by the fact that there has been a debate over what the missing witness's name actually is. Freeman, Bolden's friend, initially provided the name Bowman and then later said the name was Bolden. Freeman's girlfriend, Washington, also had trouble remembering the last name while she was testifying. Furthermore, the [trial c]ourt [found] that this witness was equally available (or unavailable) to both parties, and that furthermore, [Appellant] has not shown that the testimony of this witness would have provide[d] information or insight that would have not been merely cumulative.

Trial Court Opinion, 7/23/2018, at 12.

Upon review, we discern no trial court error or abuse of discretion in denying Appellant's request for a missing witness jury instruction. Appellant does not challenge the determination that the purported witness could not be located. As such, the witness was unavailable to both the Commonwealth and Appellant. Moreover, Appellant merely speculates as to the nature of the alleged missing witness' testimony. Hence, there was no evidence that the purported testimony would not have been cumulative. As such, Appellant's third issue lacks merit.

In his fourth issue, Appellant argues that the trial court erred in precluding him from calling Gregory Smith to testify at trial. Smith was the landlord of the property where the shooting occurred. Appellant's Brief at

24-26. Appellant proffered that the landlord would testify that a family, with a son who was about the same age as Appellant, lived in the duplex next door to Freeman a year or two before the crimes. *Id.* at 24-25. Appellant claims that the property owner's testimony would have corroborated his own testimony that "his reason for knocking on [Freeman's] door and being in that location was to stay with a friend [named] Craig." *Id.* at 25. Appellant notes that the landlord could not specifically recall the boy's name who allegedly lived next door to Freeman and, as such, the trial court precluded Appellant from calling the landlord as a witness. *Id.* at 25. Appellant claims it was trial court error to preclude the proffered testimony.

On a challenge to a trial court's evidentiary ruling, our standard of review is one of deference:

> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Hernandez*, 39 A.3d 406, 411 (Pa. Super. 2012).

Herein, the trial court determined:

> [Appellant] claimed that [the landlord's] testimony would support [Appellant's] testimony that he was looking for a friend [] named 'Craig' or 'Greg' when he went to Freeman's home[.] However, the relevancy of this testimony was not clear to the [trial c]ourt, because the residential lease does not identify the young male [for whom Appellant was allegedly searching]. Furthermore, [the landlord] did not recall the boy's name. Without additional specific

- 21 -

information, the [trial c]ourt precluded [the] landlord [] from testifying.

Trial Court Opinion, 7/23/2018, at 11-12.

We discern no error or abuse of discretion. Here, the relevancy of the proposed evidence was unclear. The landlord was uncertain regarding key elements of Appellant's proffer. Moreover, even if Appellant were looking for a person his age at the duplex next to Freeman's residence, Appellant has not explained how it would have exculpated him from shooting the victim or materially aided his defense. Appellant's purported reason for being in the location was irrelevant as to whether Appellant was the perpetrator of the crimes. Accordingly, the trial court did not abuse its discretion in precluding the landlord from testifying.

In his fifth issue on appeal, Appellant argues that the jury's verdict was against the weight of the evidence presented at trial. Appellant's Brief at 26-28. Appellant claims that, "there were a minimum of four individuals present when the victim was accidentally shot and killed." *Id.* at 26. Appellant claims that the evidence presented at trial showed that two people, other than defendant, had firearms. *Id.* at 26-27. He contends that "[o]ther than Freeman, none of the Commonwealth witnesses were able to identify [Appellant] as the shooter or as possessing a weapon." *Id.* at 27. Appellant asserts that the Commonwealth failed to establish the trajectory of the fatal bullet and offered gunshot residue evidence as proof that Appellant was in the vicinity of a fired weapon, but failed to prove that he was the actual shooter.

*Id.* at 27. Appellant claims that the Commonwealth's presentation of evidence that Appellant's DNA was found on the barrel of the recovered .357 mm revolver "was consistent with [his] testimony that he grabbed the gun as Freeman was attempting to shoot him." *Id.* at 27. As such, Appellant contends that "[w]ithout any ballistic support, there is no evidence to convict [Appellant] of third[-]degree murder and aggravated assault with possession of an instrument of crime." *Id.* at 28.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Thomas*, 194 A.3d 159, 168 (Pa. Super. 2018) (citation omitted).

On Appellant's weight of the evidence claim, the trial court concluded:

> [T]he jury appropriately weighed the testimony of various witnesses and [] the jury's verdict is a reasonable application of [law to] the facts. […] The jury's decision to consider the testimony of Freeman, multiple eyewitnesses, and law enforcement officials [as] more credible than the testimony of

[Appellant] is within the jury's purview as the trier of fact. Therefore, the [trial c]ourt found that the jury's verdict was not inconsistent or contrary to the weight of the evidence, and did not grant a new trial.

Trial Court Opinion, 7/23/2018, at 17.

Here, while Appellant assails the ballistic evidence and DNA evidence presented at trial as inadequate, he disregards the eyewitness testimony, video surveillance footage, and his recorded confession to police that was also presented at trial. Based on the record before us, we discern no abuse of discretion or error of law in denying relief on Appellant's weight of the evidence claim.

In his final issue presented, Appellant argues that the trial court erred by failing to grant him a hearing regarding the subsequent criminal case against Commonwealth witness, Keith Freeman. Appellant's Brief at 28-29. Appellant notes that, at trial, Freeman admitted that he faced criminal charges arising from this incident, but denied receiving any promises from the Commonwealth in exchange for his testimony. *Id.* at 28. Appellant contends that, after trial, he "discovered that the charges against Keith Freeman were *nol prosed*." *Id.* Thus, Appellant argues that the trial court erred by denying relief when "[c]ounsel sought a hearing to obtain information as to when the deal was made with Freeman and whether his [trial] testimony was inaccurate in that there was a no deal promised to him in exchange for his testimony." *Id.* at 28-29. Appellant concludes, "that this is an issue that goes to

[Freeman's] credibility and would have been something the jury should have had an opportunity to hear." *Id.* at 29.

This Court previously decided:

A trial court may grant a post-sentence [m]otion for a [n]ew [t]rial based on after-discovered evidence if the appellant shows by a preponderance of the evidence that the after-discovered evidence (1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) **will not be used solely to impeach a witness's credibility**; and (4) would likely result in a different verdict.

*Commonwealth v. Griffin*, 137 A.3d 605, 608 (Pa. Super. 2016) (internal citation omitted) (emphasis added).[5]

Here, Appellant sought the proposed after-discovered evidence to challenge Freeman's credibility by alluding to a possible motive for testimony favorable to the Commonwealth. However, an appellant seeking a new trial must demonstrate that he will not use the alleged after-discovered evidence "solely to impeach a witness's credibility." *Id.* As such, we discern no trial court abuse of discretion or error of law in denying Appellant's after-discovered evidence claim.

Judgment of sentence affirmed.

---

[5] We note that Appellant does not provide any citations to legal authority on this issue. We could find the issue waived, but decline to do so because our judicial review is unhampered by the omission.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2019