IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Caesar's Tavern, Inc.,              :
                Appellant       :
                             :
         v.                   :
                             :   No. 250 C.D. 2022
Pennsylvania Liquor Control Board    :   Submitted: February 7, 2023

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON         FILED: March 3, 2023

       Caesar's Tavern, Inc. (Licensee), appeals from the February 17, 2022 order of the Court of Common Pleas of Allegheny County (trial court) that affirmed the decision of the Pennsylvania Liquor Control Board (Board) to deny Licensee's liquor license renewal application. Upon review, we affirm.

## I. Background

       The facts underlying this matter are relatively straightforward and are summarized as follows. Licensee, a bar located in a shopping center in the borough of Turtle Creek, Allegheny County (the licensed premises), filed an application for the renewal of its restaurant liquor license for the renewal period beginning June 1, 2019, and ending May 31, 2021 (renewal application). *See* Board Opinion in Case No. 19-69289 (Board Op.) at 1-2; *see also* Trial Court Opinion dated Feb. 17, 2022

(Trial Ct. Op.) at 1. The Board's Bureau of Licensing objected to the renewal application pursuant to Section 470 of the Liquor Code,[1] 47 P.S. § 4-470, and a hearing was conducted before a Board hearing examiner. *See* Board Op. at 1; Trial Ct. Op. at 1.

Allegheny County Police (ACP) Detective Justin Desimone testified at the renewal application hearing. Detective Desimone[2] explained that, between May 2018 and February 2019, he acted in an undercover capacity with other ACP detectives and a confidential informant (CI) as part of an ongoing drug investigation that included 16 controlled drug purchases from 10 different sellers inside the licensed premises as well as the observation of multiple other instances of illicit drug activity inside the licensed premises. *See* Board Op. at 6-12; Trial Ct. Op. at 1-5.

On May 17, 2018, an ACP detective and the CI purchased approximately one gram of crack cocaine valued at approximately $100 from a non-employee Licensee "regular" (Seller 1) inside the men's restroom at the licensed premises. *See* Board Op. at 7-8; Trial Ct. Op. at 2. Seller 1 eventually pleaded guilty to drug charges in connection with this incident. *See* Board Op. at 7-8; Trial Ct. Op. at 2.

On May 24, 2018, an ACP detective and the CI again purchased drugs in Licensee's restroom, this time $80 worth of crack cocaine and 10 stamp bags of heroin purchased from a different individual (Seller 2) who was inside the licensed

---

[1] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1-101 – 10-1001.

[2] Detective Desimone has been a police officer for over 18 years and has been a narcotics detective for the last 5 years. *See* Notes of Testimony (N.T.) 1/7/2020 at 9. He has attended numerous drug trainings with the United States Drug Enforcement Administration and the Pennsylvania Attorney General's Office, has extensive experience executing narcotics search warrants, and has conducted numerous undercover drug buys and controlled buys using confidential informants. *See id.* at 10.

premises when the detective and CI arrived. *See* Board Op. at 8; Trial Ct. Op. at 2. Brown tissue paper from a dispenser in the restroom was used to package the drugs during this transaction. *See* Board Op. at 8.

On May 30, 2018, an ACP detective and the CI bought $80 worth of crack cocaine from a third seller (Seller 3) in Licensee's men's restroom. *See* Board Op. at 8; Trial Ct. Op. at 2. Seller 3 later pleaded guilty to drug offenses stemming from the May 30, 2018 sale. *See* Board Op. at 8; Trial Ct. Op. at 2.

On June 7, 2018, Detective Desimone and another ACP detective purchased crack cocaine, fentanyl, and heroin for a combined price of $150, again from Seller 1, and again in Licensee's men's restroom. *See* Board Op. at 8; Trial Ct. Op. at 2-3. Seller 1 used a scale removed from the ceiling in the restroom to measure the drugs during this transaction. *See* Board Op. at 8; Trial Ct. Op. at 2.

On August 15, 2018, Detective Desimone contacted a fourth seller (Seller 4), who directed him to Licensee and sold him crack cocaine for $50 in Licensee's restroom. *See* Board Op. at 9; Trial Ct. Op. at 3. Seller 4 used a digital scale hidden in Licensee's restroom ceiling to weigh the crack cocaine and toilet tissue from the restroom to package the drugs. *See* Board Op. at 9; Trial Ct. Op. at 3. This sale occurred around 8 p.m. *See* Trial Ct. Op. at 3.

Following the first August 15, 2018, drug purchase inside Licensee's restroom, the CI identified another seller (Seller 5) in the bar. *See* Board Op. at 9; Trial Ct. Op. at 3. The CI and Detective Desimone then purchased $60 worth of crack cocaine from Seller 5 in Licensee's restroom, again using toilet tissue to package the delivered drugs. *See* Board Op. at 9; Trial Ct. Op. at 3.

Two sales occurred the next day, August 16, 2018. *See* Board Op. at 9; Trial Ct. Op. at 3. First, watched by Detective Desimone, the CI purchased crack

3

cocaine from yet another seller (Seller 6) inside the main bar area of Licensee around 6:20 p.m. *See* Board Op. at 10; Trial Ct. Op. at 3. A little later on August 16, 2018, at around 7 p.m., the CI purchased more crack cocaine from Licensee employee Shantia Dennis (Seller 7 or Dennis) with $50 supplied by Detective Desimone. *See* Board Op. at 9; Trial Ct. Op. at 3. This purchase also took place in Licensee's bar area. *See* Board Op. at 9; Trial Ct. Op. at 3.

On January 8, 2019, Detective Desimone and the CI met another seller (Seller 8) in the bar area at Licensee and then entered the restroom at Seller 8's direction and purchased from Seller 8 two bags of marijuana for $40. *See* Board Op. at 10; Trial Ct. Op. at 4. Seller 8 later pleaded guilty to drug charges stemming from the January 8, 2019 transaction. *See* Board Op. at 10; Trial Ct. Op. at 4.

On the next day, January 9, 2019, three separate drug sales occurred. *See* Board Op. at 10-11; Trial Ct. Op. at 4. First, Detective Desimone bought $20 worth of marijuana from Seller 8 inside Licensee's restroom. *See* Board Op. at 10; Trial Ct. Op. at 4. Seller 8 later pleaded guilty to charges arising from that sale. *See* Board Op. at 10; Trial Ct. Op. at 4. Next, Detective Desimone and the CI bought $44 worth of cocaine and $50 worth of heroin from Seller 1 (the seller from the transactions on May 17, 2018, and June 7, 2018), again in Licensee's restroom using toilet tissue to package the drugs. *See* Board Op. at 10-11; Trial Ct. Op. at 4. Later, on January 9, 2019, the CI purchased $80 worth of crack cocaine from William Gibson (Seller 9 or Gibson), a Licensee bartender, in Licensee's men's restroom. *See* Board Op. at 11; Trial Ct. Op. at 4. Gibson later pleaded guilty to criminal charges arising from this sale. *See* Board Op. at 11; Trial Ct. Op. at 4.

Three more sales occurred on January 18, 2019. *See* Board Op. at 11; Trial Ct. Op. at 4. First, Gibson again sold $50 of crack cocaine to the CI in

4

Licensee's restroom. *See* Board Op. at 11; Trial Ct. Op. at 4. Next, a tenth seller (Seller 10), sold the ACP detectives and the CI $80 worth of crack cocaine in Licensee's restroom. *See* Board Op. at 11; Trial Ct. Op. at 4. A third sale of another $40 worth of crack cocaine also occurred that day in the Licensee's men's restroom. *See* Board Op. at 11; Trial Ct. Op. at 4.

Finally, on February 1, 2019, Detective Desimone and the CI again purchased $60 worth of crack cocaine in the Licensee's restroom, again packaging the drugs in toilet tissue. *See* Board Op. at 12; Trial Ct. Op. at 4.

In addition to these specific controlled drug purchases, throughout the course of their investigation, ACP personnel witnessed drug transactions occurring out in the open and in plain view inside Licensee but did not effect arrests in response to those drug sales so as not to compromise their investigation.[3] *See* Board Op. at 12; Trial Ct. Op. at 5.

Licensee's owner and manager John Biros[4] also testified before the hearing examiner and the trial court. *See* Board Op. at 12-15; Trial Ct. Op at 5-6.[5] Biros testified that he was not at the licensed premises during any of the drug sales and never witnessed any such activity. *See* Board Op. at 12 & 13; Trial Ct. Op. at 5. Instead, Biros explained that he is present at the licensed premises daily only from

---

[3] For instance, on February 1, 2019, when police and Board personnel entered the licensed premises sometime after the $60 sale of crack cocaine that occurred in the restroom, Detective Desimone witnessed an off-duty Licensee employee discard crack cocaine. *See* Board Op. at 12; Trial Ct. Op. at 5.

[4] Biros is Licensee's sole shareholder, director, officer, and Board-approved manager. *See* Board Op. at 12.

[5] *See also* N.T. 1/7/2020 at 121-166; N.T. 2/17/2021 at 20-29; N.T. 1/4/2022 at 5-35.

5 a.m. until 11 a.m., and that the bartender on duty[6] is left in charge of the licensed premises when he leaves and is instructed to write a report if any problems arise. *See* Board Op. at 12; Trial Ct. Op. at 5. Biros testified that he was not made aware of the drug sales at Licensee until a meeting with the Pennsylvania State Police, Bureau of Liquor Control Enforcement (BLCE), on February 4, 2019, and that even then he was not given any details of the drug sales or told that Licensee's employees were involved. *See* Board Op. at 12-13; Trial Ct. Op. at 5. Instead, the BLCE simply gave suggestions as to how to alleviate the drug sale concerns, such as locking Licensee's restrooms and requiring patrons to obtain a key from the bartender on duty in order to use the facilities. *See* Board Op. at 12-13; Trial Ct. Op. at 5-6. Biros explained that he complied with the BLCE's suggested actions to cut down on drug activity within the licensed premises by locking the bathrooms and changing Licensee's policy to allow only patrons to use the restrooms.[7] *See* Board Op. at 13; Trial Ct. Op. at 6.

Biros also testified that neither of the two employees involved in the criminal activity – Dennis and Gibson – was employed in a managerial role. *See* Board Op. at 14; Trial Ct. Op. at 5. Further, Biros explained that both Gibson and Dennis had been terminated prior to when he became aware of the drug activities

---

[6] Biros testified that all Licensee bartenders receive Responsible Alcohol Management Program (RAMP) training. *See* Board Op. at 12.

[7] Biros also testified that there are signs posted inside Licensee explaining that only patrons may use the restrooms, although he was not certain whether those signs were put up before or after his meeting with the BLCE. *See* Board Op. at 13; Trial Ct. Op. at 6.

6

occurring at Licensee or the criminal charges against those employees.[8]  *See* Board Op. at 14; Trial Ct. Op. at 5.

Biros also testified that Licensee had twelve surveillance cameras on the licensed premises prior to the meeting with the BLCE, and that all but one now function.  *See* Board Op. at 14; Trial Ct. Op. at 6.  Biros explained that Licensee's video recording system is capable of retaining up to 30 days' worth of recordings, and that he has complied with past requests from local police to turn over video recordings, but that no request was made for video footage of the incidents described by Detective Desimone.  *See* Board Op. at 14; Trial Ct. Op. at 6.  Biros further explained that he installed a metal detector at Licensee in 2014, but that it suffered water damage and was removed during the time of the ACP's investigation.  *See* Board Op. at 14; Trial Ct. Op. at 6.

Additionally, Biros testified that Licensee maintains a banned patrons list on which patrons are placed for misconduct such as fighting and selling drugs.  *See* Board Op. at 14-15; Trial Ct. Op. at 6.  Patrons placed on the list are permanently barred from Licensee.  *See* Board Op. at 14; Trial Ct. Op. at 6.  The list currently consists of around 80 names,[9] approximately 12 of which are barred from Licensee for selling drugs.  *See* Board Op. at 14-15; Trial Ct. Op. at 6.

Further, Biros testified that Licensee's men's restroom does not have a drop ceiling.  *See* Board Op. at 15.  Instead, he explained that the ceiling is made of solid plaster, with only a light fixture above the toilet.  *See* Board Op. at 15; *see also*

---

[8] Biros testified that his sister fired both employees for reasons unknown to him.  *See* Board Op. at 14; Trial Ct. Op. at 5.  The testimony did not explain or expand on Biros's sister's role at Licensee.

[9] Biros explained that some of the individuals on the barred list are holdovers from the list maintained by Licensee's previous owner.  *See* Board Op. at 15.

7

N.T. 1/7/2020 at 156-57; N.T. 2/17/2021 at 27; N.T. 1/4/2022 at 17. Biros compared the light fixture to an overturned shoe box, with straight sides hanging down to the ground and no ledges on which to store or hide a scale. *See* N.T. 2/17/2021 at 27-28; N.T. 1/4/2022 at 17.

By order dated August 5, 2020, the Board refused the renewal application. *See* Board Op. at 1-2. Licensee appealed to the trial court, which conducted a *de novo* hearing on the matter during which the Board entered the notes of testimony and exhibits from the license renewal hearing into evidence and at which hearing Biros further testified.[10] *See* Board Op. at 1-2. On February 17, 2022, the trial court affirmed the Board's denial of the renewal application. *See* Trial Court Order dated February 17, 2022. Licensee timely appealed to this Court.[11]

## II. Issues

On appeal, Licensee claims that the trial court erred by affirming the Board's decision to deny the license renewal application because the trial court's

---

[10] As noted above, Biros had also previously testified before the hearing examiner at the renewal application hearing. *See* N.T. 1/7/2020 at 121-67.

[11] A trial court reviewing a Board decision not to renew a liquor license hears the matter *de novo,* and may sustain, alter, modify, or amend the Board's order even when it is based upon the same evidence presented before the Board. *See* Section 464 of the Liquor Code, 47 P.S. § 4-464; *U.S.A. Deli, Inc. v. Pa. Liquor Control Bd.,* 909 A.2d 24 (Pa. Cmwlth. 2006). "[This Court's] review in a liquor license renewal case is limited to a determination of whether the trial court's findings of fact are supported by substantial evidence, whether it abused its discretion, or whether it committed an error of law." *St. Nicholas Greek Catholic Russian Aid Soc'y v. Pa. Liquor, Control Bd.,* 41 A.3d 953, 954 n.1 (Pa. Cmwlth. 2012); *see also Domusimplicis, LLC v. Pa. Liquor Control Bd.*, 202 A.3d 836, 840 n.7 (Pa. Cmwlth. 2019) ("Where a trial court heard a liquor license matter *de novo*, our review is limited to determining whether there is substantial evidence to support the trial court's findings or whether the trial court committed an error of law or abused its discretion."). Substantial evidence is such relevant evidence that a reasonable mind might accept as supporting a conclusion. *See Rosing, Inc. v. Pa. Liquor Control Bd.*, 690 A.2d 758, 760 (Pa. Cmwlth. 1997), *overruled on other grounds*, *Pa. Liquor Control Bd. v. Richard E. Craft Am. Legion Home Corp.*, 718 A.2d 276, 278 (Pa. 1998).

findings of fact were not supported by substantial evidence. *See* Licensee's Br. at 6, 27-54. Specifically, Licensee argues the trial court lacked substantial evidence to determine: (1) that Biros knew or reasonably should have known of the illegal activity occurring within Licensee;[12] (2) that the affirmative measures taken by Licensee after learning of the criminal activity were not sufficiently substantial to warrant the renewal of Licensee's liquor license;[13] (3) that a pattern of unlawful conduct that occurred within the licensed premises was causally related to the way in which Licensee ran its business;[14] and (4) that Biros had become a person of ill repute pursuant to the Liquor Code.[15]

### III. Discussion

Restaurant liquor licenses are valid for two years. *See* 40 Pa. Code § 3.2(a). Accordingly, holders of such licenses must file renewal applications every two years. *See* 47 P.S. § 4-470. The renewal of a liquor license is discretionary. *S & B Rest., Inc. v. Pa. Liquor Control Bd.*, 114 A.3d 1106, 1110 (Pa. Cmwlth. 2015). The Liquor Code sets forth the standards and procedures for the liquor license renewals and non-renewals. Section 470(a.1) of the Liquor Code provides, in relevant part:

> The Director of the Bureau of Licensing may object to and the board may refuse a properly filed license application:
>
> (1) if the licensee, its shareholders, directors, officers, association members, servants, agents or employes have

---

[12] *See* Licensee's Br. at 6, 27-34.

[13] *See* Licensee's Br. at 6, 34-39.

[14] *See* Licensee's Br. at 6, 39-52.

[15] *See* Licensee's Br. at 6, 53-54.

violated any of the laws of this Commonwealth or any of the regulations of the board;

(2) if the licensee, its shareholders, directors, officers, association members, servants, agents or employes have one or more adjudicated citations under this or any other license issued by the board or were involved in a license whose renewal was objected to by the Bureau of Licensing under this section;

(3) if the licensed premises no longer meets the requirements of this act or the board's regulations;

or

(4) due to the manner in which this or another licensed premises was operated while the licensee, its shareholders, directors, officers, association members, servants, agents or employes were involved with that license. When considering the manner in which this or another licensed premises was being operated, the board may consider activity that occurred on or about the licensed premises or in areas under the licensee's control if the activity occurred when the premises was open for operation and if there was a relationship between the activity outside the premises and the manner in which the licensed premises was operated. The board may take into consideration whether any substantial steps were taken to address the activity occurring on or about the premises.

47 P.S. § 4-470(a.1).[16]

Licensees are strictly liable for violations of the Liquor Code and the Board's regulations that occur on a licensed premises. *See Pa. Liquor Control Bd. v. TLK, Inc.*, 544 A.2d 931, 932-33 (Pa. 1988). "A licensee may also, however, be held accountable for non-Liquor Code violations (like those under the Crimes

---

[16] Section 470(a.1) was added by the Act of December 21, 1998, P.L. 1202.

Code[17] [or the Controlled Substance, Drug, Device and Cosmetic Act[18]]), if it can be established that there was a pattern of illegal activity on the licensed premises about which the licensee knew or should have known, and the licensee failed to take substantial steps to prevent such activity." *Philly Int'l Bar, Inc. v. Pa. Liquor Control Bd.*, 973 A.2d 1, 3 (Pa. Cmwlth. 2008). Thus, the Board may refuse to renew a liquor license where a licensee (1) knew, or should have known, of illegal activities by an employee or patron, and (2) failed to take substantial affirmative measures to prevent the misconduct. *See TLK*, 544 A.2d at 933.

Pennsylvania courts have long held that pervasive drug activity on a licensed premises may present a pattern of illegal activity sufficient to endanger a liquor license. *See TLK*, *supra*; *Bates v. Commonwealth*, 397 A.2d 851 (Pa. Cmwlth. 1979). In *Philly International Bar*, this Court agreed with the Board that uncontradicted testimony regarding 15 controlled buys of cocaine by a CI within a licensed premises from a regular patron of the licensed establishment represented "drug activity [] so pervasive that [the l]icensee's principals or employees should have known of the activity and taken steps to prevent it." 973 A.2d at 4. Similarly, *TLK* involved a pattern of drug trafficking at a licensed premises that included a 6-month investigation during which an undercover narcotics agent was able to purchase drugs from a patron of the licensed establishment and observed drug sales between patrons and employees and drug use in the licensed establishment's restroom. *See TLK*, 544 A.2d at 934. Our Supreme Court found the nature of this illicit activity to be pervasive enough to deem the licensee to have permitted or

---

[17] 1 Pa. C.S. §§ 101-9546.

[18] Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. §§ 780-101-780-144.

11

acquiesced in the misconduct unless the licensee was able to provide proof that it took substantial affirmative measures to prevent the activity. *See id.* Additionally, in the face of such an obvious pattern of misconduct under the Commonwealth's drug laws such that a licensee should have known of the illicit conduct, our Supreme Court has found the mere posting of signs and telling employees to be wary of drug activities insufficient to constitute the substantial measures required to prevent criminal conduct about which a licensee should have known. *See TLK*, 544 A.2d at 934; *see also Philly Int'l. Bar* (no measures taken); *but see Rosing, Inc. v. Pa. Liquor Control Bd.*, 690 A.2d 758, 762-63 (Pa. Cmwlth. 1997), *overruled on other grounds*, *Pa. Liquor Control Bd. v. Richard E. Craft Am. Legion Home Corp.*, 718 A.2d 276 (Pa. 1998) (substantial affirmative measures to prevent misconduct standard satisfied where licensee "made a zealous effort and incurred a financial burden to prevent drug-related activities on the premises while maintaining a reasonable zone of safety for themselves and their personnel" by installing exterior spotlights which were kept on all night; hiring a doorman to patrol the entrance, assess the patrons, and use a metal detector to inspect for weapons; hiring an armed security guard to assist; keeping all entrances locked and installing a buzzer at front entrance; by posting signs in and around the premises prohibiting the sale of drugs anywhere near the premises; and by disseminating letters to patrons indicating that suspicious or non-spending patrons would be removed).

    In the instant matter, the trial court found that

> [f]rom mid-May 2018 to early February 2019, there was a pattern of drug sales (no fewer than sixteen transactions) from at least ten different drug sellers inside [Licensee]. Two of the sellers were [Licensee] employees. The drug transactions involved crack cocaine, fentanyl, heroin, and marijuana. Sales were made to a CI and directly to

12

> multiple police officers. Some of the sales took place in the tavern restroom and some took place in the open area of the bar. Sales occurred in the afternoon and evening. These facts . . . lead the [trial] court to conclude that, in the time relevant to this case, [Licensee] had become a location where drug dealers could and did easily engage in their criminal conduct in violation of the laws of the Commonwealth.

Trial Ct. Op. at 7-8. The trial court determined that Biros should have known about the illegal drug transactions occurring within the licensed premises, and that his lack of knowledge resulted from inadequate oversight of the premises either by himself or by responsible managerial employees. *See id.* at 8. The trial court further determined that the evidence of record failed to demonstrate that Licensee took substantial affirmative measures to prevent criminal conduct. *See id.* Specifically, the trial court determined that Biros's "testimony about signs, a metal detector, cameras, and written reports from bartenders did not describe any effort [the trial] court would regard as a sufficiently substantial effort to detect and guard against criminal behavior." *Id.* at 8-9. Ultimately, the trial court concluded that Licensee knew or should have known about the drug activities occurring in the licensed premises and that Licensee failed to prove that it took substantial affirmative measures to prevent such criminal activities. *See id.* at 9. Based on these conclusions, the trial court affirmed the Board's refusal of the renewal application. *See id.* at 10.

We find no error in the trial court's determination. The uncontested evidence illustrates that, from May 2018 to February 2019, the ACP conducted a lengthy drug investigation that involved no less than 16 controlled drug buys from 10 different sellers inside Licensee. The police and their CI were able to purchase

13

crack cocaine, heroin, fentanyl, and marijuana of varying amounts. Multiple controlled buys occurred in License's restroom, where the drug dealers kept a scale in the ceiling to weigh and portion the drugs[19] and employed paper products available in the restroom to package and deliver the drugs for sale. Other drug sales simply occurred in the open areas of the bar. Two of Licensee's employees acted as the sellers in multiple controlled buys. Detective Desimone also testified to observing other drug sales unrelated to the ACP investigation regularly occurring in plain view within the licensed premises. The drug activity was pervasive to such an extent that Licensee knew or should have known that it was occurring. Further, the maintenance of a barred patrons list and the existence of signs inside Licensee indicating that the restrooms were reserved for the use of patrons, the non-functioning metal detector, and the pre-existing video cameras do not represent substantial affirmative measures taken to prevent the considerable amount of drug activities that regularly occurred within Licensee. Thus, we find that the trial court's findings and conclusions that Licensee knew or should have known about the drug activities occurring within its premises and regarding the insufficiency of the affirmative measures it purportedly took to prevent such activities are supported by substantial evidence and represent neither abuses of discretion nor errors of law.

To the extent Licensee argues that the trial court based its determination on inadmissible hearsay pertaining to Detective Desimone's testimony, portions of which Licensee argues he lacked first-hand knowledge, we disagree.[20] "The

_____

[19] We acknowledge that Biros's testimony regarding the restroom ceiling conflicts with that of Detective Desimone, but observe that the trial court expressly stated that, "to whatever extent testimony from John Biros conflicted with testimony presented by the [Board] . . . the [trial] court finds credibility in favor of the witnesses from the [Board]." Trial Ct. Op. at 9.

[20] *See* Licensee's Br. at 39-52.

14

admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion." *Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015) (quoting *Commonwealth v. Reid,* 99 A.3d 470, 493 (Pa. 2014)). Here, as part of the proceedings, the trial court allowed Licensee to submit objections regarding certain portions of the transcript of the proceedings before the hearing examiner that were alleged to be inadmissible hearsay. *See* Hearsay Objections; Reproduced Record (R.R.) at 249a-255a. The trial court reviewed the multiple filings related to Licensee's hearsay objections,[21] granting one and overruling the others. *See* Trial Court Order executed June 14, 2021; R.R. at 275a-76a. We find no abuse of discretion in these evidentiary determinations. Detective Desimone's testimony concerned incidents that occurred as part of a months-long undercover police investigation in which Detective Desimone participated and had intimate knowledge. His testimony pertained to descriptions of his participation in and the mechanics and results of controlled buys that occurred as part of that undercover investigation. Detective Desimone's testimony offered no third-party statements offered to prove the truth of the matter asserted. *See* Pa.R.E. 801. Further, even if we accept, as Licensee suggests,[22] that Detective Desimone did not have "first-hand knowledge" of 5 of the 16 controlled buys about which he testified, 11 controlled buys remain about which he did have personal, first-hand knowledge and testified, which alone would suffice as evidence of illegal behavior adequate for the Board to deny the renewal application. *See TLK*; *Bates*. Accordingly, we agree with the trial

---

[21] The Board filed a Response to Hearsay Objections, to which Licensee filed its Response to Pennsylvania Liquor Control Board's Response to Hearsay Objections. *See* R.R. at 256a-271a. The Board thereafter filed its Surreply to Hearsay Objections. *See* R.R. at 272a-74a.

[22] *See* Licensee's Br. at 46.

15

court's conclusion that, "even if [the trial] court had granted [Licensee's outstanding] hearsay objections[], and stricken the corresponding parts of the testimony, there would remain in the record sufficient testimony of other drug transactions such that this court's ruling affirming the [Board's] decision would not change." Trial Ct. Op. at 10-11.

Finally, to the extent Licensee argues that the trial court erred because the Board Opinion makes a finding that Biros was no longer a reputable person as required by Sections 102 and 470 of the Liquor Code, 47 P.S. §§ 1-102 and 4-470,[23] Licensee is not entitled to relief. Firstly, the trial court did not in any way rely on Biros's status as a person of either good or ill repute as determinative of whether to affirm the Board's refusal of the renewal application. *See generally* Trial Ct. Op. Further, even assuming the trial court did so rely, the trial court properly affirmed the Board's denial of the renewal application for the independent reasons set forth above. Accordingly, error resulting from the Board's characterization of Biros as a person of ill repute, or the trial court's reliance thereon, if any, was harmless.

### IV. Conclusion

For the reasons stated herein, we affirm the trial court order.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[23] *See* Licensee's Br. at 53-54.

16

Caesar's Tavern, Inc.,              :
         Appellant        :
                            :
        v.                 :
                            :   No. 250 C.D. 2022
Pennsylvania Liquor Control Board   :

## O R D E R

AND NOW, this 3rd day of March, 2023, the February 17, 2022 order of the Court of Common Pleas of Allegheny County is AFFIRMED.

 

_____
CHRISTINE FIZZANO CANNON, Judge